**NATIONAL BY-PRODUCTS, INC.,**
**Petitioner/Cross-Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD,**
**Respondent/Cross-Petitioner.**

**Nos. 89-2326, 89-2475.**

United States Court of Appeals, Seventh Circuit.

Argued April 16, 1990.

Decided May 7, 1991.

v.

**COUNTY OF COOK, et al.,**
**Defendants-Appellees.**

**No. 89-3631.**

United States Court of Appeals, Seventh Circuit.

May 3, 1991.

Paul A. Curtis, Gamble, Riepe, Webster, Davis & Green, Des Moines, Iowa, for petitioner/cross-respondent.

Barbara A. Atkin, John C. Truesdale, Judith P. Flower, Aileen A. Armstrong, N.L.R.B., Appellate Court, Enforcement Litigation, Washington, D.C., Joseph A. Szabo, Director, Philip E. Bloedorn, N.L.R.B., Region 30, Milwaukee, Wis., Donald J. Crawford, N.L.R.B., Region 13, Chicago, Ill., for respondent/cross-petitioner.

Before BAUER, Chief Judge, EASTERBROOK and KANNE, Circuit Judges.

KANNE, Circuit Judge.

Following a sequence of two representation elections, the National Labor Relations Board certified the Teamsters "General" Local Union No. 200, affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America, as the collective bargaining representative for a certain unit of employees of National By-Products, Inc. National By-Products disputes the validity of the certification and alleges that the Board improperly set aside the results of the first election. The union counters that National By-Products unlawfully threatened and discriminated against union supporters prior to the first election and thus the set-aside and certification were both valid. The Board agreed with the union and found that the company violated sections 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. § 151, et seq. Today we review the Board's decision.

I.

The National Labor Relations Board conducted the first representation election on June 19, 1987 pursuant to a petition for representation filed on May 15, 1987 by the union. Seventeen ballots were cast for the union and twenty-two cast against; there were two challenged ballots. The union filed objections to the results and claimed that National By-Products had coerced employees by threatening them with the delay of plant expansion plans unless the union issue was resolved, and discriminating against union supporters by imposing a delayed and severe disciplinary action on an employee who allegedly violated the company's no-solicitation policy. These objections were the subject of a hearing conducted at the behest of the regional director on August 27, 1987.

At the hearing, the hearing officer observed the witnesses' testimony and examined the evidence; he then recommended in his report that the Board sustain the objections and direct a second election. National By-Products filed exceptions to the report. On October 19, 1988, the Board overruled National By-Products' exceptions, adopted the hearing officer's report and recommendation, and ordered a second election. The second election was held on December 12, 1988 and resulted in twenty ballots cast for the union and eighteen cast against with one challenged ballot. National By-Products filed objections to the results of the second election and claimed that the employees were improperly given the impression that National By-Products acted in an illegal manner with respect to the first election and that the results of the first election should have been upheld as the employer's conduct prior to and during the first election was well within the bounds of the law.

The regional director recommended that the Board overrule the objections and certify the union; National By-Products filed exceptions to the regional director's report. The Board considered the exceptions, but adopted the regional director's recommendation and overruled the objections. On February 24, 1989, the Board issued a certificate of representation and the union requested that National By-Products bargain with it.

National By-Products refused to bargain and the union filed a charge. Pursuant to that charge, the regional director issued a complaint alleging that National By-Products' refusal to bargain violated sections

8(a)(1) and (5) of the Act. In its answer, National By–Products admitted their refusal to bargain but asserted that no violation had occurred because the union had been improperly certified as the bargaining representative. General Counsel filed a motion for summary judgment on April 20, 1989, and alleged that there were no triable issues as National By–Products merely sought to litigate again the initial representation proceeding.

On June 15, 1989, the National Labor Relations Board found that all representation issues were or could have been litigated in the underlying representation proceeding and that National By–Products had not offered any newly discovered and previously unavailable evidence, nor alleged any special circumstances which would require the Board to reexamine its decision made in the representation proceeding. The Board granted General Counsel's motion for summary judgment and issued a decision and order that National By–Products by refusing to bargain had engaged in unfair labor practices in violation of sections 8(a)(1) and (5) of the Act, and that National By–Products must cease and desist from engaging in unfair labor practices, bargain upon request with the union, and post appropriate notice. National By–Products now seeks review of that decision and order.[1] The company claims that its actions were not coercive and argues that the results of the first election should be reinstated, or in the alternative, the second election should be set aside due to events which preceded the second election and interfered with the employees' exercise of free choice. The Board has cross-petitioned for enforcement of its order. If the Board properly certified the union, then the company violated sections 8(a)(1) and (5) since they have admitted their refusal to bargain. *See Beloit Corp., Castings Div. v. NLRB*, 857 F.2d 1154, 1156 (7th Cir. 1988). Because we find that the union was properly certified after the second election,

we enforce the Board's decision that the company violated sections 8(a)(1) and (5) of the Act.

## II.

National By–Products owns a plant in Berlin, Wisconsin where it processes animal remains into marketable products. Wisconsin By–Products first built the Berlin plant in approximately 1955; National By–Products ultimately purchased the facility in 1983. The business was owned originally by the Langenhorst family; Lawrence Langenhorst has managed the plant since 1955.

### A. Coercive Threats

In April of 1987, National By–Products' management announced to the employees that the company planned to expand the Berlin facility and that construction would commence the following month. On May 15, 1987, the union filed a petition for representation of a particular unit of employees at the plant; the Board scheduled an election for June 19, 1987.

The hearing officer found that prior to the election, Lawrence Langenhorst told employees that construction plans had been put on hold and encouraged them to believe that he was too busy to proceed with construction plans because of the union campaign. Langenhorst testified that at a meeting of drivers he said, "I [can] not take care of the day-to-day matters, [ ] hold meetings with supervisors and make an attempt to answer questions and concerns of the employees and build the plant at the same time." Langenhorst admitted that the meetings and employee questions and concerns he had referred to were related to the union organizing campaign. Langenhorst explained to the hearing officer that the delay in construction had been caused by delayed bids on new equipment and the new business of handling bulk grease.

---

**1.** To obtain judicial review of the Board's decision in the underlying representation proceeding (which is not itself a final appealable order), the company refused to bargain with the union following the second election and thereby exposed itself to an unfair labor practice charge.

This court may consider the disputed representation election (i.e., the first election) when considering the appeal from the Board's resolution of the unfair labor practice charges. *NLRB v. Service Am. Corp.*, 841 F.2d 191, 193 n. 3 (7th Cir.1988).

Langenhorst further explained that employees were not told about these reasons for the construction delay because management felt they were privileged company information. Langenhorst also testified that at a June 11 meeting of first and third shift employees, an employee asked whether National By–Products would build the plant; Mike Morris, the regional manager, responded, "Why should National By–Products invest in a new plant if management and the employees cannot get along?"

Wayne Gustke, a union supporter, testified that on June 10, Langenhorst told him and four other truck drivers that he could not fight the union and build the plant at the same time. David Shilling, an employee, testified that on June 10, Langenhorst said that his job was like truck driving, "I can only drive ten hours a day, I have to take a break, with the union things going on and other things, it just was not possible to build [at the same] time." Further, another employee, Gary Albrecht, testified that his supervisor asked him prior to the election, "Wouldn't you feel bad if the union came in and the plant was closed?" Although Albrecht could not recall any details concerning this conversation, the hearing officer found that Albrecht's testimony supported the union's objections.

After considering the entire record and observing the testimony and demeanor of the witnesses, the hearing officer found that the employer's tactics had a coercive effect on employees' actions at the polls. Specifically, the hearing officer found that Lawrence Langenhorst implied and encouraged employees to believe that construction of the new plant was being delayed because the question of representation had been raised. The hearing officer found that Langenhorst could have explained to the employees that the delay was caused by bidding problems or other lawful reasons; rather than doing so, he reported that he was too busy to spend time on construction plans because of the union campaign. The hearing officer concluded that Langenhorst's strategy encouraged the employees to believe that the delay was caused by their union activity and thus coerced employees into refraining from supporting the union.

## B. Coercive Discrimination

On May 14 or 15, National By–Products posted a written warning notice which prohibited the discussion and distribution of literature concerning non-work matters, during work time or any non-work time where it would interrupt the work of other employees. The notice indicated that, "The company will not tolerate violations of this policy." On May 15, Wayne Gustke approached the mill manager and asked him when his crew would go on break so that Gustke could talk with them. Gustke left after the manager indicated that it would be at least another hour. On May 16, the office manager refused to give Gustke a list of the names of the employees. On May 22, an employee, Scott Schmude, complained to his supervisor about Gustke saying that Gustke was trying to get everybody to go union, "[he was] going on and on and kept hitting on it every day." Schmude signed a written statement which reported that Gustke distracted him from his job duties on May 15 at 1:45 p.m. Gustke testified that he discussed the union on only one occasion with Schmude.

On June 3, Gustke was issued a written warning for discussing non-work matters during work time. When Gustke asked for specifics concerning the misconduct, the plant manager refused to identify any incident. Gustke showed the written warning to other employees and told them he had received it because of his solicitations on behalf of the union. Gustke was the only employee who had been issued a written warning for violations of the May 14 written policy.

Management issued verbal warnings to two other employees, Harold Nigbor and Pat Leone, for violations of the no-solicitation policy. Lawrence Langenhorst, the plant manager, reprimanded Nigbor when he overheard Nigbor talking to one or more other employees during work time. He called Nigbor aside and told him that he should refrain from campaigning against the union until "[you are] on your noon

hour or your break or if you are punched out, but [don't] stop another employee from doing his job." Pat Leone was verbally reprimanded by his supervisor when he, after punching out, went into a production area and engaged in conversation with other employees who were working at the time. These two verbal reprimands occurred sometime between May 14 and June 3. Neither incident was recorded in writing, nor were any written reprimands issued. The management and employees involved in those incidents could not identify any approximate dates when the events occurred. Lawrence Langenhorst testified that Nigbor and Leone were not issued written warnings because they did not persist in their misconduct after they received a verbal warning. However, Langenhorst admitted that Gustke had not received a verbal warning prior to the June 3 written warning.

The hearing officer found that in Wayne Gustke's case, management abandoned its policy of progressing from verbal to written warnings, and reacted almost three weeks after the reported events occurred. The hearing officer determined that the written warning was discriminatorily motivated by Gustke's union activity. The hearing officer concluded that the written warning combined with Gustke's explanation to the other employees as to why he was warned, i.e., because of his union activity, had a coercive effect upon the voting employees.

**2.** The Board conducted the first election on June 19, 1987, and the second election eighteen months later on December 16, 1988. If the Board had not set aside the results of the first election, a second election could have been held anytime after June 19, 1988. *See* 29 U.S.C. § 159(c)(3) (No election may be directed if in the preceding 12 months a valid election was held.). By the time the second election finally came to pass, the union could have requested and perhaps prevailed in another election without having attacked the results of the first election. However, this observation does not advance our analysis since the union in fact sought a Board remedy and the company now alleges irregularities in the second election caused by the Board's remedy.

**3.** The purpose of requiring such notices is to provide official notification to all voters without

## III.

Unfortunately, we cannot dispose of this case simply by finding that the second election should be certified because it could have been held even if the Board had not set aside the first election.[2] The company complains of irregularities in the second election resultant from actions taken by the Board pursuant to the underlying representation proceeding. They argue that the second election should be invalidated because employees were influenced by the notices which the company was forced to post after the Board wrongly set aside the first election.[3] The notices contained admissions by National By–Products that they had engaged in unfair labor practices. The notices may have affected the votes of some of the employees; hence the results of the second election may have differed had the company not been forced to admit to some wrongdoing. In addition, the results of an election ordered by the Board in accordance with objections raised by one of the parties may differ from one initiated at the request of a union representative or company management.

Since we have determined that the notices may have influenced the results in the second election, we must address the question of whether or not the notices were properly required. The order to post notices was valid if the company engaged in objectionable conduct prior to the first election.[4] *See Lufkin Rule*, 147 N.L.R.B. 341.

detailing the specific conduct involved as to the reason why the elections were set aside. *The Lufkin Rule Company and International Union, United Automobile, Aerospace and Agriculture Implement Workers of America,* 147 N.L.R.B. 341, 344 n. 2 (1964).

**4.** The notice in part reads, "The election conducted on June 19, 1987 was set aside because the National Labor Relations Board found that certain conduct of the Employer interfered with the employees' exercise of a free and reasoned choice." We agree with the regional director that the language employed in the notice was appropriate as it tracked exactly the language approved in *Lufkin Rule* where the Board found that the notice did not in any way indicate that the Board favored the union over the employer in the second election.

If the notices were justified and the Board properly set aside the first election, then the company's objections to the second election fail and we must enforce the Board's order. This leads us to our review of whether or not the Board erred in upholding the union's objections to the employer's conduct prior to the first election.

## IV.

It is well-established that this court must be deferential in its review of a Board decision. *NLRB v. Lovejoy Indus., Inc.*, 904 F.2d 397, 400 (7th Cir.1990); *Northern Wire Corp. v. NLRB*, 887 F.2d 1313, 1317 (7th Cir.1989). We may not displace the Board's selection between two conflicting views of the evidence, but we may set aside the Board's decision when we cannot "conscientiously find that the evidence supporting that decision is substantial when viewed in the light that the record entirely furnishes, including the body of evidence opposed to the Board's view." *Weather Shield Mfg., Inc., Millwork Div. v. NLRB*, 890 F.2d 52, 57 (7th Cir.1989) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 485, 71 S.Ct. 456, 463, 95 L.Ed. 456 (1951)). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Roadmaster Corp. v. NLRB*, 874 F.2d 448, 453 (7th Cir.1989) (quoting *Universal Camera*, 340 U.S. at 477, 71 S.Ct. at 459); *accord NLRB v. Del Rey Tortilleria, Inc.*, 787 F.2d 1118, 1121 (7th Cir.1986). Factual determinations may not be overturned unless the hearing officer completely disregarded sworn testimony, accepted testimony which was on its face unbelievable or other extraordinary circumstances existed. *Tuf-Flex Glass v. NLRB*, 715 F.2d 291, 295 (7th Cir.1983).

Section 8(a)(1) protects employees against employers' interference with, restraint or coercion of employees who exercise their right to form, join or assist labor organizations. *See* 29 U.S.C. § 158(a)(1). Threats of discipline and other reprisals against employees for engaging in union activity violate section 8(a)(1) of the Act because such conduct reasonably tends to coerce employees in the exercise of their rights, regardless of whether it does, in fact, coerce. *Northern Wire*, 887 F.2d at 1317; *see also Weather Shield*, 890 F.2d at 57; *NLRB v. Berger Transfer & Storage Co.*, 678 F.2d 679, 690–91 (7th Cir.1982). "The Board relies on its experience and expertise in labor elections to determine, under all the peculiar circumstances present, whether the conduct could reasonably be expected to have an impact on the election." *NLRB v. Southern Health Corp.*, 514 F.2d 1121, 1123 (7th Cir.1975) (citing *Hollywood Ceramics Co.*, 140 N.L.R.B. 221, 224 (1962)). As the D.C. Circuit has recognized, "If the Board has reached a rational conclusion concerning whether the atmosphere surrounding the election so attenuated free choice that a rerun election was necessary, we will not presume ourselves—occupying a vantage point remote in time and place from the election at issue—to be better able than the Board to assess the impact of alleged instances of misconduct on an election." *Timsco, Inc. v. NLRB*, 819 F.2d 1173, 1176 (D.C.Cir. 1987) (quoting *Amalgamated Clothing and Textile Workers Union v. NLRB*, 736 F.2d 1559 (D.C.Cir.1984)).

The Supreme Court has said that coercive threats may be implied rather than stated expressly:

Any assessment of the precise scope of employer expression, of course, must be made in the context of its labor relations setting. Thus, an employer's rights cannot outweigh the equal rights of the employees to associate freely, as those rights are embodied in § 7 and protected by § 8(a)(1) and the proviso to § 8(c). And any balancing of those rights must take into account the economic dependence of the employees on their employers, and the necessary tendency of the former, because of that relationship, to pick up intended implications of the latter that might be more easily dismissed by a more disinterested ear. Stating these obvious principles is but another way of recognizing that what is basically at stake is the establishment of a nonper-

manent, limited relationship between the employer, his economically dependent employee and his union agent.... *Weather Shield*, 890 F.2d at 62 (quoting *NLRB v. Gissel Packing Co. Inc.*, 395 U.S. 575, 617–18, 89 S.Ct. 1918, 1941–42, 23 L.Ed.2d 547 (1969)). "To fall within the ambit of § 8(a)(1), either the words themselves or the context in which they are used must suggest an element of coercion or interference." *Midwest Stock Exchange, Inc. v. NLRB*, 635 F.2d 1255, 1267 (7th Cir.1980) (citations omitted). Factors to be considered in determining whether threats create the type of fearful climate which the Board or the courts have found to be grounds for setting aside an election include the timing of the threat (i.e., did the threat occur during the critical period between the filing of the petition and the election, *Ideal Electric and Mfg. Co.*, 134 N.L.R.B. 1275 (1961)), whether the threat was vague and subject to more than one interpretation, whether the threat was isolated, whether other employees knew of the threatening statements, and the level or status of the employees who uttered the threats. *See NLRB v. Browning–Ferris Indus. of Louisville, Inc.*, 803 F.2d 345, 347–49 (7th Cir.1986).

### A. Coercive Threats

█ We believe that there is substantial evidence in the record to support the hearing officer's finding that company management implied and encouraged employees to believe that construction of the new plant was delayed because the question of representation had been raised. The evidence in this case shows that the company planned to expand their facility, and that management told the employees, prior to the filing of the union's petition for representation, that such expansion would soon commence. The expansion did not begin as announced by the company, and the facts indicate that the representation election was at least one of the reasons for the delay. But management's comments emphasized that union activity caused the delay. As the hearing officer pointed out, the plant manager could have explained to the employees other reasons for the delay (i.e., bidding prob-

lems, new business in bulk grease, etc.). Instead, his remarks consistently referred to the time-consuming union campaign.

All comments were made during the month after the union filed the petition, but prior to the election. The remarks were made by Larry Langenhorst and Mike Morris, two upper-level managers. The comments made by these managers were not vague, nor were they isolated or ambiguous. Management repeatedly remarked on plant expansion, and each remark directly or impliedly attributed delays to union activity. In addition, there was adequate evidence that a number of employees heard the comments and that many of the employees knew of the other statements. The employees reasonably could have concluded that the delay was caused by their union activity, and if they stopped supporting the union, construction would begin. Here, the evidence supports the conclusion drawn by the hearing officer that management's strategy encouraged the employees to believe that the delay in construction was caused by their union activity, and thereby coerced employees into refraining from supporting the union.

### B. Coercive Discrimination

█ "An employer may have and enforce a rule prohibiting solicitation by union and other employees in working areas during working hours." *Midwest*, 635 F.2d at 1270 (citing *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372 (1945)). "Where an employer discriminates in the enforcement of a no solicitation rule in favor of anti-union solicitation by employees the employer's act is an unfair labor practice." *Revere Camera Co. v. NLRB*, 304 F.2d 162, 165 (7th Cir.1962). Wayne Gustke, a union supporter, received a written warning three weeks after he allegedly violated the no-solicitation rule. At least two of the alleged violations occurred when Gustke spoke with two supervisors (the mill manager and the office manager); they did not verbally reprimand Gustke at the time of his requests. Moreover, the hearing officer found that the company had never established when or

under what circumstances the alleged incident with the employee Schmude occurred. In Gustke's case, management had first-hand knowledge of two requests to supervisors for information (time of break, list of employees), but no first-hand knowledge of the solicitation of any non-management employees.[5] In contrast, management observed the violations of the non-union supporters and immediately reprimanded them for soliciting employees. We believe that the hearing officer properly found that the disparity in treatment here was not justified. The record does not support the company's argument that Gustke's violations were of a more serious and ongoing nature and thus warranted more severe disciplinary action. The company argues also that Gustke's warning was written because employees approached management after the incidents and complained about his behavior. The facts do not support this argument either; two of Gustke's alleged violations occurred with supervisors who could have quite easily reprimanded him verbally at the time of the violations.[6] It is of no consequence that employees learned of the written warning from Gustke himself; it is important only that other employees knew of the written warning. The employees could reasonably have concluded that the company singled out Gustke because of his union activities, such a conclusion could coerce employees and cause them to refrain from supporting the union. Here there is substantial evidence to support a finding that the company violated section 8(a)(1) by discriminatorily applying the no-solicitation rule.

### V.

▮ The hearing officer's findings that the company violated section 8(a)(1) by impliedly threatening to delay plant expansion because of union activity and discriminatorily enforcing the no-solicitation rule in

favor of non-union supporters is supported by substantial evidence in the record. With the determination made in the underlying proceeding, we find that the Board did not err in setting aside the results of the first election, ordering the posting of the *Lufkin* notices and ordering the second election. We agree with the Board that there were no irregularities in the second election, thus we uphold the certification of the union and find that the company violated sections 8(a)(1) and (5) by refusing to bargain upon request with the union.

We hereby grant the Board's petition to ENFORCE its decision and order.

---

5. The hearing officer assumed that the requests for information directed to the supervisors violated the no-solicitation rule; even when considering these encounters to be violations, he still found discriminatory treatment because the warning to Gustke was neither immediate nor verbal.

6. Perhaps the supervisors did not believe that Gustke's requests violated the no-solicitation rule ...