In the
United States Court of Appeals
For the Seventh Circuit

No. 01-2528

NATIONAL LABOR RELATIONS BOARD,

Petitioner,

v.

CLINTON ELECTRONICS CORPORATION,

Respondent.

On Petition for Enforcement of an Order
of the National Labor Relations Board

Argued January 18, 2002--Decided March 25, 2002


  Before MANION, ROVNER, and EVANS, Circuit
Judges.

  EVANS, Circuit Judge.  The National Labor
Relations Board seeks enforcement of its
order finding that the Clinton
Electronics Corporation committed unfair
labor practices.

  Clinton manufactures and sells cathode
ray tubes, monitors, and other
electronics products at its facility in
Loves Park, Illinois. In the summer of
1995, the United Steelworkers of America,
AFL-CIO-CLC, began an organizing effort
at the facility. The union filed an
election petition and the Board ordered
an election. The union subsequently
requested the withdrawal of the election
petition. The Regional Director of the
NLRB approved the request, and no
election was held.

  Subsequently, the union filed unfair
labor practice charges against Clinton.
The Acting Regional Director issued two
complaints. A consolidated hearing was
held before an administrative law judge,
and three incidents were found to violate
the Act. The NLRB, by a three-member
panel with one member dissenting, upheld
the decision of the ALJ with minor
modifications. The Board seeks
enforcement of the order.

  Briefly, the incidents are as follows.

An employee, Bonnie Smith, received a subpoena to appear at a Board representation hearing. Smith asked Bernadine Prock for her opinion of the union while the two were on the production floor. Smith and Prock were friends, but Prock was also Smith's supervisor, having become a supervisor a few months earlier after working 27 years as an hourly employee. Prock replied, "Off the record, Bonnie, it's my opinion that we could all be looking for a job." Another employee, Holly Vineyard, overheard this conversation and asked Prock why she would say something like that. While Smith was walking away, Prock responded, "Because we would all be looking for jobs if the union came in there." Prock then commented on Vineyard's attendance record, saying that if the union was elected, Vineyard "probably wouldn't even have a job." Vineyard said, "If a union got in here I would have sick days and personal days and I wouldn't have a problem at all." Prock then stated, "We would not get personal or sick days" if there was a union.

The second incident involved two other women who had been friends for a number of years. But, as well as being a friend whom she had known for 10 to 15 years, Betty Krueger was also Debbie Williams' immediate supervisor. Williams was unsure about what she thought about the union and asked Krueger to arrange a meeting with the company employee relations supervisor to discuss unionization. Then Williams attended her first union meeting, after which another employee told Krueger that she had seen Williams at the meeting. Krueger, in turn, told Williams that she "knew Williams went to the union meeting." Williams responded, "I thought it was our right to be able to do that." Krueger said, "Yes, it is." That was the end of the conversation about the union.

The final incident involves the company's rule governing solicitations and distribution of materials. The rule states that all solicitations are prohibited "except when both the person doing the soliciting and the person being solicited are on break, on meal time, or otherwise are properly not engaged in performing their work tasks." Despite this rule, the company permitted, or at

least tolerated, solicitations for things like sports pools, Girl Scout cookie sales, and merchandise sales to benefit other groups. No employees were ever disciplined for these activities.

One day, maintenance worker Daniel Lee left his department to go to another department, where he spoke with some of the employees. He engaged employee Leonard Walsh in a conversation about the union. Two supervisors observed Lee talking to Walsh but said nothing. A few days later, Lee and other union supporters were standing on the parking lot handing out flyers. As Walsh entered the lot the union supporters stopped him, and Lee asked him if he had thought more about supporting the union. Walsh complained to his supervisor that he "got bothered Monday and I figured maybe [Lee] got the message and would leave me alone. People been knocking on my door every day at home and now they're going to interfere with me pulling into the parking lot. Possibly making me late." Walsh asked the supervisor how the union members knew where he lived. He then said, "I want to make a complaint about being harassed at work. I didn't think that the company could do anything about getting harassed at home but this was starting to interfere with my work, getting to work. Being on time." The supervisor reported this conversation to a manager, who then spoke with Walsh.

The company issued a written warning to Lee for violating the no-solicitation policy based on the conversation inside the facility. The notice said "Nature of Violation: Complaints have been brought to our attention that you violated the solicitation policy on page 27-policy 2 of the Company handbook." The company would not tell Lee who complained and refused to listen to his denials of misconduct. As we have said, over one dissent, the Board upheld findings that these three incidents amounted to unfair labor practices.

Section 7 of the National Labor Relations Act (29 U.S.C. sec. 157) grants employees the right to "self-organization, to form, join, or assist labor organizations . . . and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . ." Section

8(a)(1) of the Act (29 U.S.C. sec. 158(a)(1)) makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7." An employer violates Section 8(a)(1) by coercively interrogating employees about their support for the union or by threatening adverse economic consequences, such as job loss or closing of a plant, if the employee engages in union activities. Multi-Ad Servs., Inc. v. NLRB, 255 F.3d 363 (7th Cir. 2001); NLRB v. Q-1 Motor Express, Inc., 25 F.3d 473, 477 (7th Cir. 1994). Clinton was found to have violated Section 8(a)(1) in these incidents.

Section 8(a)(3) of the Act (29 U.S.C. sec. 158(a)(3)) makes it an unfair labor practice for an employer to discriminate in regard to any condition of employment in order to "discourage membership in any labor organization." An employer violates Sections 8(a)(3) and (1) of the Act by taking adverse actions against an employee for engaging in union activity. Jet Star, Inc. v. NLRB, 209 F.3d 671 (7th Cir. 2000). Clinton was found to have violated this section in the Lee incident.

The Board's findings of fact are "conclusive" if supported by substantial evidence. Section 10(e) of the Act, 29 U.S.C. sec. 160(e); Universal Camera Corp. v. NLRB, 340 U.S. 474 (1951). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support" the Board's conclusion. National By-Products, Inc. v. NLRB, 931 F.2d 445, 451 (7th Cir. 1991). In addition, we owe deference to the Board's inferences and conclusions drawn from the facts. U.S. Marine Corp. v. NLRB, 944 F.2d 1305 (7th Cir. 1991) (en banc). This Board-friendly standard of review does not mean, however, that we roll over and play dead. We must "examine all of the evidence in context to ensure that the Board's findings fairly and accurately represent the picture painted by the record." NLRB v. Harvstone Mfg. Corp., 785 F.2d 570, 575 (7th Cir. 1986).

The incident involving Krueger and Williams involves an alleged unlawful interrogation. In evaluating whether an interrogation is coercive we look to the factual context in which the questioning

occurred. Multi-Ad Servs. In NLRB v. Acme Die Casting Corp., 728 F.2d 959, 962 (7th Cir. 1984), we set out a number of pertinent inquiries about the interrogation:

[T]he tone, duration, and purpose of the questioning, whether it is repeated, how many workers are involved, the setting, the interrogator's authority, the ambience of the questioning (has the company created an atmosphere of hostility to the union?), and, more doubtfully, whether the worker answers truthfully.

Krueger made a statement that she understood Williams had been at the union meeting; apparently, unintimidated by the statement, Williams pointed out that she had a right to be there. Krueger did not pursue the topic, nor did she object to Williams' view that she had a right to be at the meeting. The conversation was extremely short. Krueger did not seek Williams out to talk to her; they met by accident on that occasion and Williams initiated the dialog. Of further, and major, significance is the fact that the two women had a longstanding friendship. Neither this, nor, for that matter, the relationship between Prock and Smith, was a purely business-like, hierarchical relationship between a boss and an employee. Krueger, in fact, was a low-level supervisor. It is hard to find anything resembling coercion in this encounter. What occurred, we think, is a far cry from what one would ordinarily conclude is "coercive interrogation." Thus, we conclude that there is no substantial evidence to support an unfair labor practice finding on this point.

The Board found that Prock's statements to Smith constituted a threat of job loss if the union were certified. While the ALJ discussed the subsequent statements to Vineyard, it was Prock's statement to Smith that they could all be looking for jobs if the union came in which constituted the unfair labor charge before the ALJ and the Board, as both correctly recognized.

It is well-established that a threat of a plant closing is a per se violation of Section 8(a)(1). Multi-Ad Servs. The reach of that section is limited by Section 8(c), 29 U.S.C. sec. 158(c),

which provides that an employer's expressions of "any views, argument, or opinion . . . shall not constitute or be evidence of an unfair labor practice . . . if such expression contains no threat of reprisal or force or promise of benefit." A statement must be evaluated in the context in which it was made. NLRB v. Gissel Packing Co., 395 U.S. 575 (1969); NLRB v. Champion Labs., Inc., 99 F.3d 223 (7th Cir. 1996).

Looking at Prock's statement in context leads us to conclude that the record lacks substantial evidence to support a finding of an unfair labor practice. The statement, made in a casual conversation on the factory floor, is not clearly a threat of job loss; it is an expression of a personal opinion. Prock qualified her statement as her opinion and, further, said her view was "off the record." And who was she? Like Krueger, she was a low-level supervisor, who had only recently been made a supervisor. She continued to socialize with the employees who had been her friends before she became a supervisor. She did not suggest that she was speaking on behalf of higher level management. Her remark was her view, perhaps her personal fear, of job loss if the union were certified. Prock was herself hardly in a position to threaten job loss. The record is full of speculation regarding the effects of the statement, but speculation is not evidence. We find no substantial evidence supporting this finding of the Board.

Finally, the Lee episode. The Board found that Clinton's actions violated, as relevant here, Section 8(a)(3) and (1) of the Act, which makes it an unfair labor practice for an employer to discourage membership in a labor organization. An employer violates these sections by taking adverse action against an employee for engaging in union activity. NLRB v. Joy Recovery Tech. Corp., 134 F.3d 1307 (7th Cir. 1998). Whether an employer's adverse action violated the Act usually depends on the employer's motive. If substantial evidence supports the Board's finding that anti-union considerations were a "motivating factor" in an adverse action taken against an employee, the decision of the Board must be affirmed unless the record supports a conclusion that the employer would have taken adverse action even in the absence of

union activity. If the Board finds that the reason given by the employer either did not exist or that the employer did not rely on that reason, the inquiry is over. Jet Star, Inc. The Board's decision as to Lee is, we think, supported by substantial evidence.

There is substantial evidence to show that the written warning to Lee was motivated by union animus. To establish anti-union animus the Board must establish that the employee was engaged in union activities, that the employer knew of the activities, that the employer harbored animus toward union activities, and that there was a causal connection between the animus and the decision to discipline. Multi-Ad Servs. Here, the warning was issued in the midst of the union-organizing campaign. The evidence shows that Clinton became aware of Lee's union activities. The evidence also shows that even though a supervisor and a manager observed Lee's conversation with Walsh inside the factory, the company took no action until it later learned, when Walsh complained about Lee's solicitation, that the conversation was related to union activity. The company disciplined Lee immediately after learning that he was soliciting for the union. The company also issued the warning without conducting an independent investigation into Walsh's allegations. After Lee received the warning, the company refused to listen to his denials.

In addition, the Board reasonably found that the company's proffered reason for disciplining Lee--that he violated the no-solicitation policy by the conversation with Walsh on the factory floor--was pretextual. The ALJ noted that Lee could not be disciplined for solicitation at Walsh's home or in the parking lot as both actions are protected by the NLRA. See Republic Aviation v. NLRB, 324 U.S. 793 (1945). The only thing the company could discipline him for was the conversation. But the company did not show it would have disciplined Lee for that conversation in the absence of his protected activity. First of all, we again note that a manager and a supervisor saw that the conversation was going on but did not object to it. It was only after Walsh complained about Lee's union activity that anything was done. The fact that the conversation passed

without incident until Walsh complained supports the finding that the company's claim that the conversation (without regard to its content) was the reason for the discipline is simply not true. The fact that the company departed from its prior practice in administering Lee's discipline adds further support to the Board's finding.

Finally, the company violated Section 8(a)(1) of the Act by interfering with the right to self-organization by itsdiscriminatory enforcement of the no-solicitation rule. Rights protected under the NLRA include the right of individual employees to solicit on behalf of a union-organizing campaign. However, with respect to solicitation, an employer has a legitimate interest in maintaining discipline and production. For that reason it may, in fact, limit solicitation generally during work time. Republic Aviation. However, discriminatory enforcement of a valid no-solicitation rule violates the Act. That is what happened here. This kind of disparate enforcement of an otherwise valid no-solicitation rule violates Section 8(a)(1). Midwest Stock Exchange, Inc. v. NLRB, 635 F.2d 1255 (7th Cir. 1980).

On the basis of violations found in the Lee incident, the Board's request for enforcement of its order is GRANTED. As to the other two incidents, enforcement is DENIED. No costs are awarded.

MANION, Circuit Judge, concurring in part and dissenting in part. I fully agree with the court that the Board's unfair labor practice findings against Clinton with respect to the "Smith/Prock" and "Krueger/Williams" incidents are not supported by substantial evidence. I depart, however, from the court's conclusion that substantial evidence supports the Board's finding that Clinton violated sec.sec. 8(a)(3) and (1) of the Act when it reprimanded Daniel Lee for soliciting co-worker Leonard Walsh in a harassing manner, about joining the union, during the company's business hours.

Lee began working in Clinton's

maintenance department in 1977. On February 5, 1996, during regular work hours, Lee left the maintenance department and went to the yoke pinning department where he engaged in a conversation with Walsh about joining the union. Walsh complained to his supervisor, Emma Hall, that Lee was harassing him about joining the union. Walsh informed Hall that Lee had solicited him for union membership on numerous occasions outside of work, and was now bothering him during the workday, even though he had clearly expressed to Lee that he was not interested in joining the union. Clinton responded to Walsh's complaint by issuing Lee the following warning: "[c]omplaints have been brought to our attention that you violated the solicitation policy on page 27-policy 2 of the company handbook. Any other violation of company policy will result in further disciplinary action."

As the court acknowledges, Lee asked Walsh to join the union on several occasions. See ante at 3. Although it is true that many of the solicitations, while no doubt intrusive on Walsh's personal privacy (e.g., bothering him at home), constitute protected activity under the NLRA, see Republic Aviation v. N.L.R.B., 324 U.S. 793, 803 n.10 (1945), Lee's solicitation of Walsh at his work area during regular business hours is not. See Nat'l By-Products, Inc. v. N.L.R.B., 931 F.2d 445, 452 (7th Cir. 1991) (holding "'[a]n employer may have and enforce a rule prohibiting solicitation by union and other employees in working areas during working hours.'") (citation omitted). There is also no dispute about the validity of Clinton's no-solicitation rule. Therefore, the only questions before us are whether substantial evidence supports the Board's findings that: (1) Clinton was motivated by anti-union animus when it issued the warning to Lee, and (2) Clinton enforced its no-solicitation rule in a manner violative of the NLRA.

The court contends there is substantial evidence to show that the written warning to Lee was motivated by union animus. See ante at 8. First, the court notes "the warning was issued in the midst of the union organizing campaign," and that Clinton was aware of Lee's union activities. Id. Second, the court relies

heavily on the fact that Clinton took no action against Lee until after Walsh filed a complaint, even though a supervisor and manager witnessed Lee speaking with Walsh at his work area in the yoke pinning department. Id. Third, the court notes that Clinton "issued the warning [to Lee] without conducting an independent investigation into Walsh's allegations," and "refused to listen to his denials." Id. Finally, the court contends that Clinton departed from prior practice in issuing Lee a warning for violation of the no-solicitation rule. Id. at 9.

While it is uncontested that Clinton issued the warning to Lee during a union organizing campaign, and that the company was aware of Lee's pro-union sentiments, the remainder of the court's conclusions are not supported by the evidentiary record. As an initial matter, there should be no inference of anti-union animus simply from the fact that a manager and supervisor allowed two employees to briefly engage in a conversation during the workday. As the court notes, at the time of this conversation Clinton was aware of Lee's union activity. Yet, at the same time, neither the supervisor nor the manager who witnessed the conversation was aware that Lee was soliciting Walsh for union membership (or for that matter anything else), or that Walsh considered Lee's solicitation of him as harassment. Additionally, Clinton issued the warning based on Walsh's subsequent complaint. Walsh was tired of being repeatedly harassed by Lee about joining the union. He told Lee that he did not want to join the union, but Lee persisted in interrogating him about the matter. While Walsh could not stop Lee from bothering him outside of work, he knew that Lee was not permitted to bother him during work. Once this occurred, Walsh filed a complaint against Lee, and Clinton responded to the complaint by issuing the warning.

Furthermore, Lee's warning from Clinton was minimal. Clinton neither fired nor suspended him. Lee was given the opportunity to respond to the charges filed against him on the notice form. Instead of addressing the charges, however, Lee responded: "I feel I have been set up with this fictitious warning.

They know I am involved with the USSW [i.e., the union]." This response shows that Lee was fully aware that the warning concerned his solicitation of employees for union membership. Nevertheless, he did not request that the company clarify the nature of the complaint filed against him, or that the matter be looked into any further. He simply denounced the complaint as being "fictitious." Given the inadequacy of this response, as well as the minimal nature of discipline involved, it was improper for the Board to infer anti-union animus from the manner in which Clinton addressed Walsh's complaint. We have held that an employer "should be free to prohibit solicitations on the premises that interfere with or bother employees or customers . . . ." 6 West Ltd. Corp. v. N.L.R.B., 237 F.3d 767, 780 (7th Cir. 2001). The Board's decision to discredit Clinton's nondiscriminatory reason for issuing the warning was unjustified, and amounts to the Board substituting its own business judgment for that of the employer. See, e.g., N.L.R.B. v. Louis A. Weiss Mem'l Hosp., 172 F.3d 432, 446 (7th Cir. 1999) (holding that "'[a]n employer not motivated by anti-union animus may freely exercise its business judgment . . . and the board should not substitute its judgment for the employer's.'") (citation omitted). It is worth noting that the ALJ's own findings of fact demonstrate that Clinton had a legitimate reason for issuing the warning notice to Lee:

[Lee's] explanation for even being in the yoke pinning department on February 5 is contradicted by the undisputed evidence about the work, which had been assigned to him at that time. His description of the work which he purportedly had been performing there, greasing a conveyor, is contradicted by the uncontestedevidence that conveyor greasing could not be accomplished while that department was operating, nor could it be accomplished in so short a period and in the manner which Lee described it.

Lee's blatant misrepresentation is consistent with his "fictitious warning" response to Clinton's reprimand.

The ALJ's finding that "solicitations-- for sports and other pools, for school related events such as Market Days and for Girl and Boy Scout sales--occurred

with significant regularity at [Clinton's] facility," and that "some employees had participated in such activities during work time and, in fact, that supervisory personnel had participated in such activities on occasions when employees were involved were supposed to be working," does not support a conclusion that the company's issuance of the warning was fueled by anti-union animus or that its no-solicitation policy was enforced in a manner violative of the NLRA. "Whenever the Board cites anti-union discrimination as the basis of its orders, we have required it to establish that the cases among which the employer has distinguished are indeed 'similar' in all respects relevant to labor policy, and we have refused to enforce the Board's orders when it falls short." Guardian Indus. Corp. v. N.L.R.B., 49 F.3d 317, 321 (7th Cir. 1995). This incident falls short of that standard. We have held that "[a]n employer may not discriminate in violation of section 8(a)(1) by denying 'union access to its premises while allowing similar distribution or solicitation by non-employee entities other than the union.'" 6 West Ltd. Corp., 237 F.3d at 779 (emphasis added) (citation omitted). There is nothing in the record to support a finding that Lee's solicitation of Walsh is similar to other solicitations involving sports pools or Girl Scout cookies. First, there is no evidence of other incidents where employees complained of being solicited in a harassing manner, or that, upon being notified of such conduct, Clinton failed to address an employee's complaint. Second, we have held that solicitations for sports pools (i.e., the NCAA tournament), Girl Scout cookies, and other community or personal projects are not similar to unwanted union (or anti-union) solicitations. Id. at 780 ("[S]olicitations for Girl Scout cookies, Christmas ornaments, hand-painted bottles, and the other examples listed by the ALJ certainly cannot, under any circumstances, be compared to union solicitation as support for the ALJ's determination that the [employer] engaged in a discriminatory application of its non-solicitation policy.").

In sum, I completely agree with the court's conclusion that the Board's findings of unfair labor practice for the

"Krueger/Williams" exchange and the "Smith/Prock" encounter are not supported by substantial evidence. While I acknowledge that the "Lee/Walsh" incident presents a closer question, Lee's solicitation on behalf of the union is not similar to the examples of community service or personal solicitations enumerated by the ALJ. Because substantial evidence does not exist to support the Board's findings that Clinton's decision to issue the warning to Lee was motivated by anti-union animus, or that the company enforced its no-solicitation policy in a manner violative of the NLRA, I would deny the Board's request for enforcement of its order with respect to the Lee/Walsh incident as well.