# In the

# United States Court of Appeals

## For the Seventh Circuit

---

Nos. 01-2418, 01-2857

HUCK STORE FIXTURE COMPANY,

*Petitioner/*
*Cross-Respondent,*

*v.*

NATIONAL LABOR RELATIONS BOARD,

*Respondent/*
*Cross-Petitioner.*

---

Petition for Review of Order of
the National Labor Relations Board

---

ARGUED MAY 31, 2002—DECIDED APRIL 21, 2003

---

Before HARLINGTON WOOD, JR., COFFEY, and ROVNER,
*Circuit Judges.*

COFFEY, *Circuit Judge.* Huck Store Fixture Company
("Huck Store" or "Company") seeks review of the order
(the "Order") of the National Labor Relation Board ("NLRB"
or "Board") requiring the Company to reinstate 33 employ-
ees who were laid off or discharged between March 4, 1997
and March 11, 1997. In its Order, the NLRB found that
Huck Store had committed multiple violations of the
National Labor Relations Act, 29 U.S.C. §§ 157, 158(a)(1)

("NLRA" or "Act"). The NLRB filed a cross-application for enforcement of its Order. We order the enforcement of the decision of the NLRB.

## I. BACKGROUND

Huck Store manufactures and sells fixtures used in retail stores. Gene Prock, the President of Huck Store, began operating the Company in November 1995. In the first six months of 1996, demand for the Company's products exploded, due primarily to a number of large orders placed by Border's Book Stores. To meet the increased demand, the Company increased its workforce from 15 to 185 production workers. Some of the workers were hired directly by Huck Store; others remained employees of temporary staffing service, Snelling Personnel Services, and worked for Huck Store on a temporary basis.[1]

In mid-January 1997, after assembling Huck Store's workers and managers for a meeting, Prock informed his employees that new orders for Huck Store products had been placed that year, and that "business had built up quicker than he had anticipated." (Tr. at 117) He stated that the outlook for the year was "good" and that there "wasn't much to worry about." *Id.*

Thereafter, senior management scheduled meetings with the Company's four major customers to confirm anticipated business for 1997; on February 4, 18, and 19, 1997, senior managers met with the Company's major customers to confirm their orders for the year. Although management learned that orders from one customer would

---

[1] Snelling and Huck Store had a working agreement that Huck Store had the option to hire a Snelling temporary employee as a permanent employee once the employee had worked over 300 hours at the Company.

be reduced somewhat, overall, the Company's business outlook for the year was not significantly altered. (Tr. at 1315.)

Meanwhile, Huck Store's workers began to engage in unionization activities. On January 20 and 30, 1997, the Mid-Central Illinois District Council of Carpenters (the "Union") held informational meetings attended by Huck Store employees. During a third meeting, held on February 6, 1997, organizers circulated union authorization cards, which were signed by the attending employees. An organizational committee comprised of seven Huck Store workers was also formed at the meeting.

On February 13, 1997, having learned of the workers' steps toward unionization, Prock gathered his employees, "jump[ed] up on a work bench [waving] a Union authorization card in his right hand . . . [and] said, himself and management was [sic] aware of this and they strongly opposed [it] and if anybody would like to ask for their cards back and tear them up they could have them." (Tr. at 54) (testimony of Cecil Steffin, employee of Huck Store). Prock went on to opine that he had treated the workers "fairly and with open door policy." *Id.*

After Prock's public denouncement of the Union, and in spite of the fact that Prock purportedly told Huck Store supervisors not to interrogate workers regarding Union activities, a number of such instances did occur. For example, the day after management became cognizant of union activities at the Company, Supervisor James Winking approached an employee, Jerry Schieferdecker, and asked what the employees thought of the Union. When Schieferdecker responded that it was time something was done about workers' rates of pay, Winking stated ominously that, if confronted with the Union, Huck Store

would close its doors.[2] Four days later, on February 19, Winking threatened another employee, James Gallagher, that if the Union organized, Huck Store would move its plant "out of town." (Tr. at 562.)

Another time, Supervisor Ronald Mock asked employee Thomas Boone whether he had attended the Union meetings. Boone replied that he had, but refused to answer Mock's inquiries about who had attended the meeting. Similarly, Supervisor Roger Trimpe asked employees James Mooneyham and Jeremy Fruit whether they were going to attend the next Union meeting, warning them that if they did, he would recognize their car and would have to fire them. When Fruit commented that such actions sounded illegal, Trimpe replied that Fruit could not be fired for his union activity, but that he could be fired because of poor job performance.

Supervisor Paul Lowe confronted employee Richard Budde and asked why he (Budde) was attempting to organize the Union, and inquired as to whether Budde felt guilty about the possibility that employees would lose their jobs because of what he was doing. As their conversation continued, Lowe became agitated and stated that if Budde did not like working at the Company, he should "get the hell out" of there before he cost everybody their jobs.

In addition to these tactics of coercion and surveillance, Huck Store supervisors also committed unlawful labor

---

[2] Although Winking denied threatening plant closure, the ALJ found Winking's testimony incredible, in light of the fact that he gave inconsistent testimony at the hearing. NLRB App. at 12. On appeal, Huck Store does not dispute the ALJ's findings regarding the coercive practices of Huck Store supervisors; accordingly, this Court's recitation of the facts reflects the uncontested findings of the ALJ.

practices by: (1) requiring supervisor permission prior to employee circulation of a petition related to union activity; (2) urging employees to sign an antiunion petition; and (3) threatening physical violence against the "boys . . . who signed antiunion cards." (Tr. at 570.)

On February 20, the same day that Union representatives distributed literature to workers at the Company, and around a week after Huck Store management became aware of workers' unionization efforts, Prock and other senior managers at Huck Store resolved to implement a reduction in the Company's workforce. According to Huck Store, while 1997 sales figures were projected to be better than those of the previous year, the Company had built up around $2.1 million in inventory, and such excess inventory necessitated a reduction in workforce.

Thus, in spite of the fact that Huck Store employees were not expecting to undergo performance evaluations for another two months, the Company's management decided to perform another round of evaluations in March to determine which employees would be laid off or terminated. The evaluations weighed factors such as employee attendance, work habits, quality of work, knowledge, and "attitude."

Based on the evaluation results, the Company discharged eight Huck Store employees and three Snelling employees on March 4, and ten Snelling employees on March 7. Huck Store also laid off 12 permanent Huck Store employees on March 11. Of the eight Huck Store employees discharged on March 4, five had signed union authorization cards. Of the 12 Huck Store employees laid off on March 11, ten had signed union authorization cards, and four were also members of the Union's seven-person organizing committee. Amidst this workforce reduction process, on March 10, the Company hired ten Snelling employees who had previously been working only on a

temporary basis. A week thereafter, the Company granted wage increases to thirty of the remaining employees.

Subsequent to the downsizing, the Union filed a charge of unfair labor practices and the Board's General Counsel issued a complaint against Huck Store based on the allegations made by the Union. After a five-day hearing, an administrative law judge (the "ALJ") issued a recommended order, finding that Huck Store violated the NLRA by: (1) interrogating and threatening employees in connection with their union activities (in violation of Section 8(a)(1) of the Act); and (2) discharging or laying off 33 members of its workforce on account of antiunion animus (in violation of Section 8(a)(1) and (3) of the Act).

On appeal to a three-member panel of the NLRB, Huck Store contested the ALJ's recommendation as to the workforce reduction, but did not dispute the ALJ's finding that Huck Store's coercive interrogation and surveillance of its employees' union activities violated the Act. On July 13, 2001, the Board's three-member panel issued an order adopting the ALJ's conclusion that the 33-person workforce reduction violated Section 8(a)(1) of the Act. The Board ordered Huck Store to cease and desist from its coercive and threatening tactics, to reinstate the Huck Store employees it had discharged or laid off, and to "make whole" (by issuing back compensation) the 13 Snelling employees who were discharged in violation of the Act.

## II. ANALYSIS

Under the NLRA, employees have the right to form, join or assist labor organizations, and to engage in activities for the purpose of collective bargaining. *See* 29 U.S.C. § 157 (Section 7 of the Act). Section 8(a)(1) of the Act protects such rights, by making it unlawful for an employer to "interfere with, restrain, or coerce employees in the exer-

cise of the rights guaranteed in section 7." The Act also prohibits an employer from taking adverse action against an employee in order to discourage union activities. 29 U.S.C. § 158(a)(3) (Section 8(a)(3) of the Act).

To prove that a Section 8(a)(3) violation has taken place under the analysis set forth in *NLRB v. Wright Line, a Division of Wright Line, Inc.*, 251 NLRB 1083 (1980), the General Counsel must demonstrate that antiunion animus was a "substantial or motivating factor" in the employer's decision to take adverse action against the employees. *NLRB v. Joy Recovery Tech. Corp.*, 134 F.3d 1307, 1314 (7th Cir. 1998). Antiunion animus is established by showing that the employees were engaged in union activities, that the employer knew of and harbored animus toward the union activities, and there was a causal connection between the animus and the implementation of the adverse employment action. *NLRB v. Clinton Electronics Corp.*, 284 F.3d 731, 738 (7th Cir. 2002).

Once the elements are met, an employer may avoid a finding of unfair labor practices by showing that it would have taken the adverse action regardless of the employees' unionization efforts. *Id.* If the Board rejects the employer's proferred explanation by finding either that the reason "did not exist or that the employer did not rely on that reason, the inquiry is over." *Id.*

Our review of the Board's determination of a Section 8(a)(3) violation is limited; we ask only whether the Board's factual conclusions are supported by substantial evidence, and whether its legal conclusions have a "reasonable basis" in the law. *NLRB v. Cook County School Bus., Inc.*, 283 F.3d 888, 892 (7th Cir. 2002). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support the conclusion of the Board. *NLRB v. Clinton Electronics Corp.*, 284 F.3d at 737.

At this stage, we must not "dabble in fact-finding and may not dispute reasonable determinations simply because we would have come to a different conclusion if we reviewed the case *de novo*." *Livingston Pipe v. NLRB*, 987 F.2d 422, 426 (7th Cir. 1993). In conducting our review, we show particular deference to factual findings of credibility; such assessments are adopted by this Court, absent "extraordinary circumstances." *L.S.F. Transp., Inc. v. NLRB*, 282 F.3d 972, 980 (7th Cir. 2002).

### A. Antiunion animus

Huck Store contends that the NLRB erred in determining that the March 1997 layoffs were unlawful, arguing first that there was insufficient evidence to support the Board's finding of antiunion animus. The Company's challenge to the finding of antiunion animus is curious, given that Huck Store does not dispute the NLRB's finding that its supervisors participated in numerous unlawful antiunion activities, including circulating antiunion petitions and threatening physical harm to union supporters.

There is ample evidence in the record that those who made the workforce reduction determination both had knowledge of and had exhibited animus toward the workers' efforts to unionize. President Prock, for instance, publicly voiced his disdain for the Union; and, although he had a right to engage in such expression, in so doing he exhibited his knowledge that the union was attempting to organize. And, as far as "animus" is concerned, the Board found (and Huck Store does not dispute) that Soebbing, a senior-level manager who took part in the March 20, 1997 decision to lay off workers, had committed an unfair labor practice by circulating and obtaining signatures to an antiunion petition. There is thus substantial evidence to support the Board's finding that antiunion animus was a motivating factor in Huck Store's decision to reduce its workforce.

### B. *Legitimate business purpose*

Huck Store also argues that, even assuming the General Counsel demonstrated a prima facie claim of antiunion animus, the Company nonetheless had a legitimate business reason for reducing its workforce—namely, excess production capacity. Huck Store reasons that, considering the substantial amount of inventory on hand in February 1997, it needed only $35,000 of daily production to meet the then-current demand for its product (based on its estimates of annual demand derived from information given at the February meetings with customers). Thus, the Company argues, in light of its estimated $45,000 of daily production capacity at the time, the most efficient course was to reduce the workforce by 20 to 25%.

Although it did not explicitly address the issue of inventories, the Board did expressly reject as incredible the Company's claim that its implementation of a workforce reduction was done for business reasons. The Board based its conclusion on the following observations: (1) Huck Store's business outlook at the time the workforce reduction decision was made was not significantly different from the outlook in January (one month prior), at which time Prock had told the employees the outlook for the year was "good" and that there "wasn't much to worry about";[3] (2) in the midst of its 20-percent workforce reduction, the Company actually *hired* ten Snelling employees to work on a permanent basis (just one day prior to firing 12 of its own employees); and (3) a disproportionate percentage of workers who had not signed the antiunion petition

---

[3] In other words, the February meetings with clients largely verified previous estimates of the level of 1997 sales, making it unclear what had changed between Prock's "business looks good" assessment, and management's conclusion that Huck Store had to implement a drastic workforce reduction.

(27 percent) were laid off or fired during the workforce reduction, as compared to those who had signed the antiunion petition (6 percent).[4] *See* Huck Store App. at 3-5.

Given the deferential standard of review, which requires us to enforce the Board's decision if it is supported by substantial evidence, we see fit to enforce the Board's Order in this case. Huck Store essentially attacks the ALJ's determination "[ ]not [to] credit Prock's or Soebbing's testimony that the decision for the layoffs and discharges w[as] business related . . . ." NLRB App. at 15. Because the Board's Order was based on credibility determinations of the ALJ, as well as reasonable inferences drawn therefrom, we will not disrupt such determinations even if we might have interpreted the record differently. *NLRB v. O'Hare-Midway Limousine Service, Inc.*, 924 F.2d 692, 696 (7th Cir. 1991).

As the Board rightly noted, Huck Store's decision to reduce its workforce was made less than a week after the management became aware of its workers' efforts to unionize. The timing of the decision—so closely correlated with the commencement of union-related activities at the Company—renders suspect Huck Store's claim that the decision was purely based on economic factors. *See, e.g., NLRB v. Joy Recovery Tech. Corp.*, 134 F.3d 1307, 1314 (7th Cir. 1998) (noting that, in the case at bar, "timing [wa]s everything.").

And, while we are aware that Huck Store's inventory levels were high in February of 1997, we do not believe the record supports that, absent the developments related to the Union, the Company would have implemented the February 1997 workforce reduction in any case. We note

---

[4] An "antiunion" worker is defined as a worker who signed the antiunion petition, while a "prounion" worker is defined as anyone who did not sign the antiunion petition.

at the outset that high inventory levels are not necessarily undesirable. For instance, in this case, President Prock himself admitted that the Company had *purposefully* been "building [up] inventory levels" for the legitimate business purpose of "trying to level out production over [the] year." (Tr. at 1289).[5] Evidently, then, it was Huck Store's stated goal in January 1997 to *increase* its inventory levels.

Therefore, in order to support its claim that high inventory levels ultimately became a "bad" thing, requiring a workforce reduction, the Company must show that its inventories had grown to levels that were high *relative to what the Company expected, intended, or desired them to be*[6]—not just that inventories were high as an absolute matter. Because Huck Store's "high inventory" justification lacks adequate support in the record, we conclude that the Board's treatment of the evidence on this issue was reasonable and proper.

As the Board noted, Prock, in January 1997, announced a positive outlook for the Company's 1997 business fore-

---

[5] By increasing inventories and leveling out production, Huck Store would avoid having to pay workers to work overtime during the high-demand parts of the annual business cycle.

[6] In the alternative, Huck Store could demonstrate that demand was significantly *less* than anticipated. Huck Store has *not* made this argument, however, admitting instead that its business outlook was essentially the same in February 1997 (when the decision to reduce workforce was made) as it was in January 1997 (when Prock stated to his employees that business looked "good"). *See* Tr. at 1316 ("the difference between the first part of January and the end of February was not that significant . . ."); and Huck Store Reply Br. at 3 ("Prock[ ] believe[d] 1997's business 'looked good' [in January of 1997] and . . . this did not change after the customer meetings on February 18-19" and "the . . . meeting [to discuss workforce reduction] was called because of HSFC's *inventory buildup*, not because of any changes in customer expectations. . .").

cast, as well as plans to "build[ ] [up] inventory because [Huck Store] had commitments and [Prock] was trying to reduce overtime work which [had been] necessary the prior year." Huck Store App. at 13. Nonetheless, in February of 1997, at which time Huck Store's business outlook "had not changed significantly," *id.*, Huck Store's managers resolved to implement a massive workforce reduction. Given that Huck Store concedes there was no significant change in the Company's business outlook for 1997 between January (when things looked "good" and the goal was to *build up* inventories to even out production demands), and March 1997 (when the management decided to implement a 20% reduction in workforce, purportedly because inventories were "too high"), *see* Huck Store App. at 13, Huck Store Reply Br. at 3, one wonders what—other than the workers' unionization activities— could have precipitated the change in upper-management's business policy.[7]

---

[7] Nor does Huck Store present any evidence that it considered or in any way anticipated a need to reduce its workforce *until* the February 20, 1997 meeting, which took place less than a week after management learned of the unionization efforts. *Cf. NLRB v. Vemco, Inc.*, 989 F.2d 1468, 1485 (6th Cir. 1993) (noting that the employer, Vemco, had, in the face of uncertainty as to its production capacity needs, previously documented its intention to layoff workers if necessary). And, although Soebbing claims that he "had been wanting to call a meeting [to discuss inventory buildup] for a month to two months," he admits that neither he nor anyone else actually called the meeting until "the day before" it took place. (Tr. at 1004) The haste with which the meeting was called, as well as the lack of explanation as to why inventory buildup was suddenly and inexplicably a "problem" (when, just a month prior, it had been a goal (Tr. at 1289)), satisfy us that the Board's decision to reject the Company's proffer as mere pretext was supported by the evidence.

These factors, combined with the fact that a relatively high percentage of pro-union workers who were terminated or laid off on account of the workforce reduction, provide substantial evidence to support the NLRB's conclusion that Huck Store was motivated by antiunion animus, rather than business considerations such as high inventory levels.

*C.  Remedy*

Huck Store argues that, even if there is substantial evidence to support the Board's finding of an NLRA violation, this Court should nonetheless refuse enforcement of the Board's remedy to the temporary employees, on the basis that the Board's remedy to the temporary employees[8] was too broad. The Board's decision, in pertinent part, ordered Huck Store to "make whole" the temporary employees who had been discharged or laid off by Huck Store, by requiring Huck Store to award them back pay (dated to the time of layoff or discharge) and to notify Snelling that it (Huck Store) had "no objection to Snelling . . . referring [the various temporary employees] to work in [the Company's] facility." NLRB App. at 7. In its brief, Huck Store claims that these temporary employees did not have an expectation of employment with the Company, and that the Board therefore had no basis to provide "make whole" relief to such workers.

In support of its argument, Huck Store notes that temporary agency employees were given the right to join a bargaining suit after the workforce reduction at issue in this case took place. Specifically, in *M.B. Sturgis, Inc.*, 331 N.L.R.B. No. 173 (2000), the Board held that tem-

---

[8] The temporary employees to which Huck Store refers were staffed at the Company on a temporary basis, while they remained employed by Snelling.

porary employees may join a bargaining unit of permanent employees, so long as they are in the same "community of interest" as the permanent employees. *Id.* However valid Huck Store's "argument" on this point may be, it comprises not more than a page of its main brief, and only a sentence of its reply brief, and is wholly inadequate and undeveloped. Indeed, Huck Store has made no argument that *M.B. Sturgis, Inc.* was wrongly decided or that the temporary employees in this case were not in the same "community of interest" as the permanent employees. Thus, to the extent that Huck Store is arguing that the Snelling employees are entitled to *no* remedy, it has waived such argument by not developing it before this Court. *See, e.g., Palmquist v. Selvik*, 111 F.3d 1332, 1342 (7th Cir. 1997) ("Even an issue expressly presented for resolution is waived if not developed.").

Moreover, insofar as Huck Store argues that the nature of the remedy afforded the temporary employees was overly broad, this Court, following the course employed by other courts under similar circumstances, finds it appropriate to leave the details of Huck Store's remedy to be resolved in compliance proceedings. *See, e.g., NLRB v. Dazzo Products, Inc.*, 358 F.2d 136, 138 (2d Cir. 1966) (noting, in the context of a seasonal temporary worker, that the employer's duties as to reinstatement of and award of back pay to the temporary employee should be left for resolution in compliance proceedings).

The order of the NLRB is hereby ENFORCED.

A true Copy:

      Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*

USCA-02-C-0072—4-21-03