

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-12-2002

# NLRB v. FES

Precedential or Non-Precedential: Precedential

Docket No. 01-2267

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"NLRB v. FES" (2002). *2002 Decisions.* Paper 489.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/489

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed August 8, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 01-2267

NATIONAL LABOR RELATIONS BOARD, Petitioner

v.

FES, (A DIVISION OF THERMO POWER), Respondent

*Plumbers and Pipefitters Local No. 520,
Intervenor-Petitioner

*(Pursuant to Clerk Order 6/26/01)

On Petition for Review of an Order of the
Benefits Review Board
(Board No. 5-CA-26276)

Argued: February 4, 2002

Before: BECKER, Chief Judge, McKEE and
BARRY, Circuit Judges.

(Filed: August 8, 2002)

AILEEN A. ARMSTRONG, ESQUIRE
DAVID A. FLEISCHER, ESQUIRE
 (ARGUED)
FRED L. CORNELL, ESQUIRE
National Labor Relations Board
1099 14th Street, NW
Washington, D.C. 20570

Counsel for Petitioner

THOMAS R. DAVIES, ESQUIRE
 (ARGUED)
MARK FEATHERMAN, ESQUIRE
Harmon & Davies, P.C.
2306 Columbia Avenue
Lancaster, PA 17603

Counsel for Respondent

DIANAH S. LEVENTHAL, ESQUIRE
FRANCIS J. MARTORANA, ESQUIRE
 (ARGUED)
O'Donoghue & O'Donoghue
4748 Wisconsin Avenue, NW
Washington, D.C. 20016

Counsel for Intervenor

OPINION OF THE COURT

BECKER, Chief Judge.

FES, a company that manufactures industrial
refrigeration equipment, has petitioned for review of an
order of the National Labor Relations Board ("the Board")
determining that FES violated SS 8(a)(1) and 8(a)(3) of the
National Labor Relations Act ("NLRA") by refusing to hire
nine job applicants due to their union membership. The
challenged order required FES to offer each applicant
instatement and back pay. The Board has cross-petitioned
for enforcement. FES raises a host of procedural and
substantive challenges to the Board's decision. The central
issues, however, are whether sufficient evidence supported:
(1) the Board's finding that anti-union animus contributed
to FES's decision not to hire the union applicants; and (2)
its finding that FES failed to establish, as an affirmative
defense, that the disparity between the union applicants'
previous wages and the lower wages offered by FES would
have led FES to reject the union applicants regardless of
the alleged animus. We conclude that the Board's findings
on these points are supported by substantial evidence on
the record as a whole, and hence we will deny FES's

2

petition for review and grant the Board's cross-petition for
enforcement.

I.

FES is a division of Thermo Power Corporation and has
an office and manufacturing facility in York, Pennsylvania.
On February 4, 1996, FES ran an advertisement in a local
newspaper seeking welders and pipe fitters. Shortly
thereafter, Terry Peck, a business agent for Plumbers and
Pipefitters Local Union 520, and five unemployed
journeymen members of Local 520 applied in person for
employment with FES as welders. They wore union hats
and union jackets when they filed their employment
applications, and videotaped the process.

FES again ran help-wanted ads for welders in March of
1996. After seeing these ads, Peck, along with three other
union members, again applied for a job at FES. On April 1,
1996, Chip Roche, FES's Vice President, was quoted in a
local newspaper as saying that FES was having trouble
finding workers, especially welders, in the York area, and
that as a result, FES might have to build a new plant out
of state. After Peck read the news story, he telephoned
Roche, and according to Peck:

> [W]e spoke briefly and I tried to explain to Mr. Roche
> how we have a common interest being that he needs
> journeymen pipefitters and welders and we have that
> type of individual available for employment. And we

> spoke shortly and he said he was not interested in the
> union or what the union could do for him or his
> company.

FES did not contact any of the union applicants or offer
them positions. Roche testified that he did not hire the
union applicants because they would not be a "good fit" for
the Company. According to Roche, to determine an
applicant's fit, FES considered the completeness of the
application, the applicant's skills and experience, the
stability of the applicant's employment history, and the
compatibility of the applicant's wage history with the wages
offered by FES.

Roche explained that the reason for the wage
compatibility criterion was to address the problem of
employee turnover -- "if you hire people . . . at wages that
are substantially under the wages that they made at
previous jobs, [they] do not tend to stay, so it increases our
risk of losing an employee after we train them." As an
example, Roche cited FES's hiring of several welders who
had been laid off from York International, which paid
higher wages than FES. According to Roche, after FES had
invested considerable time and money training these
employees, FES lost them when they were recalled to their
higher paying jobs with York.

Roche testified that FES did not interview or make offers
to any of the union applicants because most of them had
not completely filled out the applications, left gaps in their
employment history or had unstable employment histories,
and had been making higher wages than FES paid. In
particular, the union applicants all made more than $22
per hour at their previous jobs, and FES's top wage scale
for welders and pipefitters was less than $17 per hour.
Roche admitted, however, that except for Peck, who had not
worked as a welder since 1992, the union applicants
possessed the skills and experience that FES was seeking.

In particular, FES advertised that its "ideal candidate will
be certified to build Pressure Vessels per ASME Section VIII
and/or have experience building Carbon Steel Piping
Systems per ANSI B31.5." Peck testified that the union
applicants possessed the skills and experience that FES
sought, and Roche confirmed that the non-union welders
who were hired were less skilled than the union applicants.
Roche admitted that some of the (non-union) applicants
who were hired also had gaps in their employment histories
and blanks in their application forms. Roche related that
the wage compatibility criterion had been used to disqualify
non-union applicants, but could not provide specific
examples and did not know if FES would have the records
to provide such examples.

The union filed an unfair labor practice charge, and the
Administrative Law Judge (ALJ), after holding a trial, found
that FES had refused to consider the union applicants on

the basis of their union affiliation in violation ofSS 8(a)(1)

and 8(a)(3) of the NLRA. See FES, 331 N.L.R.B. 9, 34 (2000) [hereinafter FES I]. Noting that the record was insufficient to determine whether FES would have actually hired any of the applicants had it considered them on a nondiscriminatory basis, id. at 34 n.8, the ALJ stated that if at the compliance stage of the proceeding it was shown that FES would have hired any of the nine union applicants in the absence of its discriminatory refusal to consider, those applicants would be entitled to back pay and instatement in positions substantially equivalent to those for which they would have been hired initially. Id. at 34.

On appeal, the Board affirmed the ALJ's finding that FES had unlawfully refused to consider the union applicants on the basis of their union membership. See FES I at 17. The Board held, however, that the ALJ had improperly decided to wait until the compliance stage to determine whether each of the nine union applicants would have actually been hired absent anti-union animus. Id. The Board therefore remanded the case to the ALJ.

On remand, the ALJ found that the nine union applicants would have been hired but for anti-union animus, and ordered back pay and instatement for each applicant. A three-member panel of the Board, in a brief opinion, adopted the ALJ's order. See FES, 333 N.L.R.B. No. 8, 2000-01 NLRB Dec. (CCH) P 15,682 (Jan. 19, 2001) [hereinafter FES II]. The Board petitioned for enforcement of its order, and FES cross-petitioned for review. We have jurisdiction pursuant to S 10(e) of the NLRA, 29 U.S.C. S 160(e).

II.

Section 8(a)(3) of the NLRA, 29 U.S.C. S 158(a)(3), makes it an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." In FES I, the Board articulated the following framework for determining whether an employer has violated S 8(a)(3) by refusing to hire a job applicant on the basis of the applicant's union affiliation:

> To establish a discriminatory refusal to hire, the General Counsel must . . . first show the following at the hearing on the merits: (1) that the respondent was hiring, or had concrete plans to hire, at the time of the alleged unlawful conduct; (2) that the applicants had experience or training relevant to the announced or generally known requirements of the positions for hire, or in the alternative, that the employer has not

adhered uniformly to such requirements, or that the requirements were themselves pretextual or were applied as a pretext for discrimination; and (3) that antiunion animus contributed to the decision not to hire the applicants. Once this is established, the burden will shift to the respondent to show that it would not have hired the applicants even in the absence of their union activity or affiliation.

FES I at 12 (footnotes omitted). FES argues that, under this standard, there was insufficient evidence to support the Board's finding that FES unlawfully refused to hire the nine applicants on the basis of their union affiliation.

We review the Board's findings of fact under a deferential standard. "The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive." NLRA S 10(e), 29 U.S.C. S 160(e). A finding of fact is supported by substantial evidence on the record as a whole if "it would have been possible for a reasonable jury to reach the Board's conclusion." Allentown Mack Sales & Serv., Inc. v. NLRB, 522 U.S. 359, 366-67 (1998).

A.

FES argues that the Board's finding that anti-union animus contributed to FES's decision not to hire the union applicants is unsupported by substantial evidence on the record. The ALJ, whose findings the Board adopted, relied on both direct and indirect evidence that anti-union animus contributed to the decision not to hire the applicants.

The indirect evidence of anti-union animus consisted of the fact that the union applicants whom FES rejected

6

possessed the welding certifications and experience that FES sought, while applicants whom FES hired did not. See supra at 4.1 Moreover, there was evidence that FES rejected the union applicants at a time when its Vice President had publicly stated that its inability to find workers, especially welders, might force it to build a new plant out of state. See supra at 3. The ALJ found that FES's purported reasons for rejecting the union applicants -- namely, the completeness of their applications, their employment history, and their wage compatibility -- were pretexts for discriminatory hiring practices, and noted that "[t]he finding of such a pretext supports the inference of antiunion animus and discriminatory motive." FES I at 33 (citing Fluor Daniel, Inc., 304 N.L.R.B. 970 (1991), enforced 976 F.2d 744 (11th Cir. 1992) (per curiam)).

In addition to this indirect evidence of discrimination, the ALJ relied on direct evidence of discrimination, consisting of a conversation between Roche, FES's Vice President, and Peck, the union's business agent. After reading the

newspaper article in which Roche lamented that FES's inability to hire welders might force it to relocate, Peck phoned Roche to offer the services of the union welders. According to Peck, Roche responded that "he was not

_____

1. FES contends that although the ALJ inferred a discriminatory motive from FES's decision to hire non-union applicants who lacked the advertised qualifications instead of the union applicants who possessed those qualifications, the Board did not rely on this evidence, and accordingly we may not consider it. The Board's opinion, however, summarily adopted the ALJ's findings of fact. See FES I at 17 ("The judge found, and we agree, that the Respondent unlawfully refused to consider nine union applicants for employment."). Where the Board generally adopts the ALJ's findings, as the Board did here, the Board need not repeat and explicate every piece of evidence supporting the ALJ's findings.

FES argues that the Board discussed, in footnote 22 of its opinion, specific evidence that supported the ALJ's findings, and that because this footnote neglects to mention the strength of the union applicants' qualifications relative to those of the applicants hired, the Board did not rely on this evidence in finding a discriminatory motive. We read footnote 22 as simply responding to particular exceptions raised by FES to the ALJ's findings, and therefore do not understand it to be an exhaustive discussion of the evidence that led the Board to adopt the ALJ's findings.

7

interested in the union or what the union could do for him or his company." As we will explain, we believe that this evidence is sufficient to support the Board's decision.

1.

FES contends that in finding that anti-union animus contributed to FES's decision not to hire the union applicants, the ALJ improperly relied on Roche's statement that he "was not interested in the union or what the union could do for him or his company" because it is protected under S 8(c) of the NLRA, 29 U.S.C. S 158(c), which provides that "[t]he expressing of any views, argument, or opinion . . . shall not constitute or be evidence of an unfair labor practice under any of the provisions of this Act, if such expression contains no threat of reprisal or force or promise of benefit." The Board responds that we lack jurisdiction to consider FES's S 8(c) argument, since FES failed to raise it before the Board. See NLRA S 10(e), 29 U.S.C. S 160(e) ("No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances."); Woelke & Romero Framing, Inc. v. NLRB, 456 U.S. 645, 666 (1982) ("[T]he Court of Appeals lacks jurisdiction to review objections that were not urged before the Board . . . .").

The closest that FES came to raising the issue before the Board is when FES excepted "[t]o the Administrative Law Judge's mischaracterization of and improper inferences

drawn from a conversation between . . . Peck and . ..
Roche." Although FES thereby challenged the ALJ's
inference drawn from Roche's statement, FES never
specified that S 8(c) provided the basis for its challenge. The
question, then, is whether this exception sufficiently raises
FES's S 8(c) objection to preserve the issue for appeal.

The tenor of FES's challenge before the Board raised a
purely factual question as to whether the ALJ
mischaracterized FES's statement and whether a trier of
fact could reasonably infer from Roche's statement that
anti-union animus contributed to FES's hiring decisions. In
contrast, whether Roche's statement is protected under

S 8(c) raises a question of law, and is an argument not that
the statement lacks probative value, but rather that, in
light of First Amendment concerns, the statement may not
be relied on despite its probative value. See Holo-Krome Co.
v. NLRB, 907 F.2d 1343, 1347 (2d Cir. 1990) (noting that
S 8(c) was intended "to prevent chilling lawful employer
speech by preventing the Board from using anti-union
statements, not independently prohibited by the Act, as
evidence of unlawful motivation").

Accordingly, FES's exception "[t]o the Administrative Law
Judge's mischaracterization of and improper inferences
drawn from a conversation between . . . Peck and . ..
Roche" failed to raise before the Board the S 8(c) issue that
FES now presses on appeal. We therefore lack jurisdiction
to rule on FES's S 8(c) argument.

2.

FES submits that the evidence relied on by the ALJ,
including Peck's statements to Roche and the relative
qualifications of the union and non-union applicants, does
not support the finding that anti-union animus contributed
to the Board's findings. First, FES challenges the credibility
of Peck's testimony recalling his conversation with Roche,
contending that it is implausible and self-serving. See Pirelli
Cable Corp. v. NLRB, 141 F.3d 503, 518 (4th Cir. 1998)
(warning the NLRB to be wary of "self-serving rhetoric of
sophisticated union officials"). FES further argues that
because Roche made his statement to Peck in April and the
union had made its decision not to hire the applicants in
February and March, Roche's statement has little probative
value in assessing the motive for FES's refusal to hire the
applicants.

Next, FES submits that its decision to hire non-union
applicants who lacked the qualifications of the union
applicants does not establish discriminatory motive. More
specifically, FES notes that Roche testified before the ALJ
that FES typically did not hire welders with the
qualifications possessed by the union applicants:

    [W]e typically hire people who have some basic skills

who fit into the general scheme of things at FES who

9

> we can train to do things our ways. So, typically, what
> we do is break people in. We advertise for highly
> skilled, skilled people, and we get the resumes and
> applications that we get and then we sort through and
> see which are good fits and then hire people that we
> can train.

Finally, FES challenges the ALJ's inference of anti-union animus from his finding that FES's purported reasons for rejecting the union applicants, namely, the completeness of their applications, and gaps in their employment history, were pretextual. See FES I at 33 ("The finding of such a pretext supports the inference of antiunion animus and discriminatory motive . . . ."). FES argues that in finding pretext, the General Counsel impermissibly shifted the burden of proof to FES, when the ALJ noted that"[t]he criteria by which Roche claims he disqualified the union applicants do not exist in written form and are not strictly adhered to. There is no evidence they were ever applied to any applicants other than the Local 520 'salts.' " FES I at 33.2

FES's arguments illustrate that there was conflicting evidence with respect to the basis for FES's decision not to hire the union applicants, and that accordingly, reasonable triers of fact could differ as to the role anti-union animus played. Peck's testimony regarding his conversation with Roche is self-serving and perhaps somewhat implausible, but much trial testimony is self-serving, and fact finders have a right to credit it, even if it is arguably implausible. See Hanlon & Wilson Co. v. NLRB, 738 F.2d 606, 612-13 (3d Cir. 1984) ("[C]redibility decisions rest with the ALJ as long as he considers all relevant factors and sufficiently explains his resolutions."). We agree with FES that the fact that Roche's statement was made in April somewhat weakens its probative value for purposes of showing that anti-union animus contributed to FES's hiring decisions in February and March, but a reasonable fact finder could nonetheless infer from the statement that FES harbored anti-union animus in the months preceding the statement.

---

2. The term "salt" refers to union members who apply for jobs with non-union companies in an effort to organize them. See NLRB v. Town & Country Elec., Inc., 516 U.S. 85, 96 (1995).

10

The same is true with respect to Roche's attempt to explain why FES hired non-union applicants with poorer welding qualifications than the union applicants. A fact finder could permissibly discredit this testimony as inconsistent with FES's own description of the qualifications possessed by its "ideal candidate." As the ALJ explained:

Respondent advertised for skilled welders. When presented with applications from union members/voluntary organizers, who had such qualifications, FES decided to hire individuals who were significantly less qualified. Respondent's assertion that it prefers to hire individuals with basic skills and then train them "the FES way" is belied by the advertisements.

FES I at 33.

FES is correct that the ALJ noted the absence of any evidence that the hiring criteria used by FES to reject the union applicants had been consistently used to reject non-union applicants as well. The ALJ, however, did not rely solely on FES's failure to produce such evidence as the basis for his finding that anti-union animus contributed to FES's hiring decisions. Rather, the General Counsel elicited testimony from Roche that FES had not consistently applied the hiring criteria that led it to reject the union applicants. In particular, after Roche testified that some union applicants were rejected solely because of gaps in their employment histories or blanks on their application form, Roche was asked at trial whether, with respect to the non-union applicants who were hired, "[w]e might find some gaps in the employment. We might find blanks in the application form," to which Roche responded "Oh, sure." We therefore disagree with FES's contention that the ALJ improperly shifted onto FES the burden of proving that anti-union animus did not contribute to its hiring decisions, when the ALJ stated that "[t]here is no evidence that [the criterion FES used to reject the union applicants] were ever applied to any applicants other than the Local 520 'salts.' " FES I at 33.

Finally, we believe that a reasonable fact finder could infer that anti-union animus contributed to the challenged

11

hiring decisions from the testimony that the union applicants possessed the qualifications that FES itself advertised as belonging to the "ideal" candidate, yet FES hired instead applicants who lacked the advertised qualifications. See Laro Maintenance Corp. v. NLRB, 56 F.3d 224, 231-32 (D.C. Cir. 1995) (inferring discriminatory motive from, inter alia, an employer's professed desire to hire the best qualified workers and the employer's subsequent decision to hire employees with no relevant experience over union members with experience); NLRB v. General Wood Preserving Co., 905 F.2d 803, 816-817 (4th Cir. 1990) (upholding the Board's finding that anti-union animus contributed to refusal to hire, where, inter alia, an employer hired applicants with no experience over experienced workers who engaged in protected activity). Moreover, Roche's statement that he was not interested in what the union could do for FES, in response to Peck's suggestion that the union applicants could satisfy FES's

announced hiring needs, provides further support for the finding that anti-union animus contributed to FES's decision not to hire the union applicants.

Because a reasonable trier of fact could conclude that anti-union animus contributed to FES's decision not to hire the union applicants, we uphold the Board's finding on this point as supported by substantial evidence on the record. See NLRA S 10(e), 29 U.S.C. S 160(e) ("The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive."); Allentown Mack, 522 U.S. at 366-67 (noting that a finding of fact is supported by substantial evidence on the record as a whole if "it would have been possible for a reasonable jury to reach the Board's conclusion").

B.

FES argues that even if there was sufficient evidence to support the Board's finding that anti-union animus contributed to FES's decision not to hire the union applicants, FES is not liable under S 8(a)(3) since even absent anti-union animus, it would not have hired the

12

union applicants because they did not meet FES's wage compatibility criterion.

1.

Under the Board's interpretation of when a discriminatory refusal to hire a union applicant violates S 8(a)(3), FES's purported wage compatibility hiring criterion could be relevant either as part of the General Counsel's case, or as an affirmative defense. The Board in FES I explained that the General Counsel bears the burden of proving that an applicant satisfied an employer's hiring criteria only if the criteria are "publicly announced or generally known requirements of the position" and "are based on nondiscriminatory, objective, and quantifiable employment criteria." FES I at 13. The Board went on to note that "if there is any ambiguity in the employer's statement of requirements for the position or any suggestion that the requirements are not rigid (e.g., 'two years preferred'), the burden is on the employer to show that the applicant failed to meet these imprecise qualifications." FES I at 13. FES argues that under this framework, the General Counsel bore the burden of proving that the union applicants met FES's wage compatibility hiring criterion or that the criterion was pretextual.3

Reviewing the Board's application of this standard to the facts in the record before us, we are satisfied that the Board's finding that FES's wage compatibility criterion was not rigidly applied is supported by substantial evidence, and accordingly uphold the Board's decision to require FES to prove, as an affirmative defense, that absent any anti-

union animus, it would not have hired the union applicants
due to the difference between their previous wages and the

_____

3. In its brief, FES does not challenge this standard for allocating
burdens of proof, and at oral argument, FES made clear that it was
contesting only the Board's articulation of the elements of an unlawful
refusal to consider union applicants, not an unlawful refusal to hire.
Accordingly, we assume without deciding that the standard the Board
announced in FES I for allocating the burdens or proof with respect to
whether a particular hiring criterion provided a justification for refusing
to hire a union applicant is a permissible interpretation of the Act.

13

wages FES was offering. At trial, Roche testified that the
union applicants were not hired because they were not a
"good fit" for the company. According to Roche, in
determining whether job applicants would be a "good fit,"
he considers "a number of things," including the
compatibility of their previous wages with the FES pay
scale:

> One of the things I personally look for up front is the
> level of effort that is put into an application and the
> completeness that an application is filled out. Another
> is, you know, requisite skills, experience. Another one
> that we use is wage rate compatibility. You know, there
> are various things that we use.

Roche admitted, however, that none of these criteria is
rigidly applied:

> Q. And, if we looked at their applications [the
> applications of those (non-union) applicants who were
> hired], though, we would not find long work histories
> with other employers. We might find some gaps in the
> employment. We might find blanks in the application
> form. Isn't that correct?
>
> A. Oh, sure; any criteria that we apply is not going to
> be perfect in every applicant and subsequent hired
> case; but, the question is, does the total picture create
> a good fit or the likeliness of a good fit?

From this testimony, a reasonable trier of fact could find
that FES's wage compatibility criterion was not rigidly
applied, and accordingly require FES, under the Board's
unlawful refusal to hire standard, to prove as an affirmative
defense that its wage compatibility criterion would have led
it to reject the union applicants regardless of anti-union
animus. See FES I at 13 ("[I]f there is any ambiguity in the
employer's statement of requirements for the position or
any suggestion that the requirements are not rigid (e.g.,
'two years preferred'), the burden is on the employer to
show that the applicant failed to meet these imprecise
qualifications.").

2.

FES argues that even if it bore the burden of proving, as an affirmative defense, that its wage compatibility criterion

14

would have led it to reject the union applicants, the Board and the ALJ improperly prevented FES from submitting evidence on this affirmative defense on remand to the ALJ after FES's first appeal to the Board.

The ALJ, in his opinion in FES I, rejected FES's affirmative defense that regardless of anti-union animus, it would have refused to consider the union applicants because of the incompatibility of their wage histories with FES's pay scale. In particular, the ALJ found "the testimony that FES adopted a nondiscriminatory hiring policy as the result of this experience [with former employees] not to be credible," and concluded that the criterion was a"pretext[ ] for discriminatory hiring practices" and a "post-hoc justification[ ] for disqualifying a union applicant or potential union organizer." FES I at 33.

In remanding the case to the ALJ, the Board noted that any defense that had already been rejected by the ALJ, such as FES's wage compatibility defense, could not be relitigated on remand:

> Because the judge did not reach the refusal-to-hire allegation, he did not consider the "wage compatibility" criterion as a defense to that allegation. Nevertheless, the issue of the criterion was fully litigated and the judge made the findings described above, which we have approved. Accordingly, the record may not be reopened on this issue. Any consideration of the criterion on remand must be confined to the facts as already found by the judge.

FES I at 17 n.22. Accordingly, the ALJ on remand prevented FES from submitting additional evidence in support of its wage compatibility defense.

We find nothing improper in the Board's decision to prevent FES from relitigating the issue of wage compatibility on remand to the ALJ, since the record on that issue had been fully developed at trial. Accordingly, we reject FES's argument that we should refuse to grant the Board's petition for enforcement on the ground that the

15

Board improperly prevented FES from establishing its wage compatibility affirmative defense.4

FES submits that the Board and the ALJ erroneously held that an employer's application of a wage compatibility

4. FES also challenges the ALJ's refusal, on remand, to hear evidence on any other affirmative defenses FES might have. In his opinion on remand, the ALJ stated that:

> I informed the parties [after the case was remanded] that I would not consider evidence as to why Respondent would have considered the individuals it hired prior to July 20, 1998, more desirable than the discriminatees because I had already determined that the union applicants were not considered for employment for unlawful reasons. Respondent was therefore precluded from arguing that, if it had considered these applicants, it would have rejected them for lawful reasons. Moreover, I had already rejected FES's alternative rationales for failing to hire the discriminatees.

In appealing to the Board from the ALJ's decision on remand, however, FES excepted only "[t]o the Administrative Law Judge's refusal to permit Respondent to attempt to convince him of the legitimacy of its wage compatibility defense with respect to a refusal to hire allegation," and failed to except to the ALJ's refusal to entertain any other affirmative defenses it may have had. The Board therefore explicitly declined to reach the issue in FES II:

> In accordance with the Board's settled practice, our review of the judge's supplemental decision is limited to the issues raised by the Respondent's exceptions. We do not necessarily agree with the judge's discussion of what other defenses (apart from the "wage compatibility" defense) he would have entertained. In the absence of exceptions, we do not pass on this aspect of the judge's rationale.

FES II at 29,961 n.1 (citation omitted).

Because the propriety of the ALJ's decision to limit FES's affirmative defenses was not properly raised before the Board (except to the extent that FES excepted to the ALJ's refusal to consider the wage compatibility defense on remand), we may not entertain FES's argument on this issue without exceeding our jurisdiction. See NLRAS 10(e), 29 U.S.C. S 160(e) ("No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances."); Woelke & Romero Framing, Inc. v. NLRB, 456 U.S. 645, 666 (1982) ("[T]he Court of Appeals lacks jurisdiction to review objections that were not urged before the Board . . . .").

16

criterion to union applicants is per se illegitimate as an affirmative defense. Although in the ALJ opinion there is language, which we note in the margin, suggesting that he viewed an employer's use of a wage compatibility hiring criterion as inherently illegitimate, the Board opinion made clear that it was not adopting such a rule.5 In particular, the Board adopted only the ALJ's finding that the wage compatibility criterion did "not exist in written form, [was] not strictly adhered to, and thus, in the circumstances of this case, appear[s] to be [a] post hoc justification[ ] for disqualifying a union applicant or potential union organizer." FES I at 17 n.22 (emphasis added). The Board further stated that "[w]e, therefore, find it unnecessary to rely on any of the judge's additional rationale concerning

the 'wage compatibility' criterion." Id.  The Board's citation
of J.O. Mory, Inc., 326 N.L.R.B. 604 (1998), which sustained
an employer's wage disparity defense where the employer's
wage compatibility criterion was an "established hiring
policy applied in a nondiscriminatory manner," FES I at 17
n.22, confirms that the Board in this case was not adopting
a per se rule against a wage disparity defense.

Accordingly, we reject FES's argument that the Board
impermissibly interpreted S 8(a)(3) of the Act as prohibiting
an employer from ever relying on a wage compatibility
hiring criterion as a basis for refusing to hire job
applicants. We therefore turn to the question whether
substantial evidence on the record taken as a whole
supports the Board's finding of fact that FES had failed to
establish as an affirmative defense that the incompatibility
between the union applicants' previous wages and the FES
pay scale would have led FES to refuse to hire the union
applicants regardless of anti-union animus.

_____

5. The ALJ stated that "FES' disqualification of individuals for 'wage rate
incompatibility' is merely a code word for Union or union organizers . . . .
[To] recogniz[e] [FES's] 'wage compatibility' criterion as a legitimate
nondiscriminatory factor in considering job applicants . . . would
essentially allow Respondent to avoid hiring anyone who has ever been
a union journeyman." See FES I at *134, *136.

17

3.

In arguing that the Board's rejection of FES's wage
compatibility affirmative defense is unsupported by
substantial evidence, FES relies on the testimony of Roche,
who stated that in his experience, employees who make
considerably less at FES than they did at their previous
jobs tend not to stay at FES. For example, Roche explained
that FES had once hired several welders who had been laid
off from York International, which paid higher wages than
FES. According to Roche, after FES invested considerable
time and money training these employees, FES lost them
when they were recalled to their higher paying jobs. Roche
testified that since the union applicants in this case made
over $22 per hour at their previous jobs and FES's hourly
wage was only $17 per hour, they did not meet the
company's wage compatibility criterion. Roche further
testified that this decision not to hire the union applicants
based on wage compatibility was consistent with other
instances in which FES decided not to hire applicants
because their wage histories were too high.

We are sympathetic to an employer's interest in reducing
the likelihood that it will not lose its investment in hiring
and training employees who are unaccustomed to working
at the low wages offered by the employer relative to the
employees' previous employers. On the record before the
Board, however, we cannot say that a reasonable trier of
fact would be compelled to accept FES's wage compatibility

affirmative defense. Although Roche testified that the company used the wage compatibility criterion to exclude non-union applicants as well as the union applicants in this case, his testimony on this point was conclusory in nature. When pressed, Roche could not give a specific example of an instance in which the wage compatibility criterion was used to exclude non-union applicants from consideration, and was not sure whether any employment records would exist to support his assertion:

> Q. Had there been specific examples that you can think of in the last few years where someone else was -- some other applicant was rejected because his-- his history of wages was too high?

18

> A. Oh, sure.

> Q. Can you give me an example?

> A. I cannot give you an example right now, but I am sure that we can look at -- well, I am not sure if we have those records. I am sure that we have had a number of them that have applied that are, you know, just much higher than our wages.

We believe that a reasonable finder of fact could conclude that FES had not met its burden of establishing its wage disparity affirmative defense, given the absence of specific evidence that FES had consistently applied the wage compatibility criterion to union and non-union applicants alike. Cf. Kelly Construction, Inc., 333 N.L.R.B. No. 148, 2001 NLRB LEXIS 296 at *51-*53 (May 2, 2001) (noting that all the employees who were hired met the employer's wage compatibility criterion); Northside Electrical Contractors, Inc., 331 N.L.R.B. 1564, 1568 (2000) (noting a specific example of the employer using the wage compatibility criterion to deny employment to a non-union applicant with a high wage history); Wireways, Inc., 309 N.L.R.B. 245, 250 (1992) (noting that the employer used the wage compatibility criterion to screen over 300 applications received from union and non-union applicants alike).

Here, Roche's testimony that FES had consistently applied the wage compatibility criterion amounts to an unsupported, conclusory assertion, which we have held is inadequate to satisfy the movant's burden of proof on summary judgment. See, e.g., Maldonado v. Ramirez, 757 F.2d 48, 51 (3d Cir. 1985) ("An affidavit that is essentially conclusory and lacking in specific facts is inadequate to satisfy the movant's burden.") (internal quotation marks and citation omitted). Accordingly, we hold that the Board's finding that FES had failed to establish its wage compatibility affirmative defense is supported by substantial evidence. See Allentown Mack Sales & Serv., Inc. v. NLRB, 522 U.S. 359, 366-67 (1998) (holding that a finding of fact is supported by substantial evidence on the

record as a whole if "it would have been possible for a reasonable jury to reach the Board's conclusion").6

III.

For the foregoing reasons, we will deny FES's petition for review and grant the Board's cross-petition for enforcement.7

---

6. In addition to its wage compatibility defense, FES asserts a "staleness" defense. The nine union members at issue in this case applied to FES in February and March 1996. FES stipulated that it hired six welders or welder trainees in March and April 1996, but argues that as to three of the union applicants, positions would not have become available until June 1997 and 1999. FES argues that it would not have hired the union applicants for these positions, since their job applications would have been no longer retained by the time these positions opened.

We conclude that FES has waived this argument. First, FES stipulated before the ALJ on remand that it had no new defenses with respect to the three 1999 positions that were filled by non-union applicants. Second, FES failed to except to the ALJ's finding on remand that "there was a job opening for each of the discriminatees and therefore Respondent has violated Section 8(a)(3) and (1) by refusing to hire each one of them." We therefore lack jurisdiction to entertain FES's staleness defense. See NLRA S 10(e), 29 U.S.C.S 160(e) ("No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances."); Woelke & Romero Framing, Inc. v. NLRB, 456 U.S. 645, 666 (1982) ("[T]he Court of Appeals lacks jurisdiction to review objections that were not urged before the Board . . . .").

7. When the case was initially before the Board, it was presented not only as a refusal to hire case but also as a refusal to consider case. Indeed, the Board's first opinion dealt extensively with the contours of the refusal to consider doctrine. However, when the case went back to the ALJ for consideration on the merits (not in a compliance proceeding) it was decided as a refusal to hire case; the "loose end" which might have required that the refusal to consider aspect of the case be decided was tied down when it was developed that there was an opening for each union applicant prior to the July 20, 1999 hearing before the ALJ. In contrast to the original order, which is grounded on failure to consider, the later order is grounded on failure to hire, and eschews the refusal to consider issue. Understandably therefore, when we inquired at oral argument as to whether we needed to reach the refusal to consider issue, counsel agreed that we should not, because the Board, affirming

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

---

the post remand decision of the ALJ, held that FES unlawfully refused to hire all nine union applicants, and did not rely on the refusal to consider doctrine. We too agree. In view of that disposition we need not discuss the refusal to consider issue even though it has been briefed by the parties (FES having challenged the Board's refusal to consider doctrine on the ground that it is an impermissible interpretation of S 8(a)(3) of the Act).

21