In the

# United States Court of Appeals
## For the Seventh Circuit

---

Nos. 00-3194, 00-3576, 02-1227 & 02-1591

MASIONGALE ELECTRICAL-MECHANICAL, INC.,

*Petitioner, Cross-Respondent,*

*v.*

NATIONAL LABOR RELATIONS BOARD,

*Respondent, Cross-Petitioner,*

and

INDIANA STATE PIPE TRADES ASSOCIATION,

*Intervenor.*

---

Petitions for Review and Cross-Applications
for Enforcement of Orders
of the National Labor Relations Board.

---

ARGUED SEPTEMBER 23, 2002—DECIDED MARCH 21, 2003

---

Before DIANE P. WOOD, EVANS, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* Because of terminations, work restrictions, and failures to hire, the National Labor Relations Board (the Board) determined that Masiongale Electrical-Mechanical, Inc. (Masiongale) violated various provisions of the National Labor Relations Act (the Act). We find that there was substantial evidence supporting

the Board's findings and enforce the orders except for Masiongale's coercive interrogation of two employees and its termination of a different employee.

## I.  BACKGROUND

Masiongale is based in Muncie, Indiana, and performs electrical, HVAC (heating, ventilation and air-conditioning), and plumbing contracting for the construction industry. From December 1996 through September 1997, Masiongale placed advertisements in local newspapers seeking to hire plumbers for two job sites, one in Mishawaka, Indiana, and the other in Greenwood, Indiana. The ads were for "licensed plumbers and licensed assistants only." Locals 172 and 661 of the Indiana State Pipe Trades Association (the union) were interested in these notices, and encouraged their unemployed members to apply. Jack Neal, a business agent for Local 661, went to Masiongale's office and picked up an application, which he photocopied and made available to members of both locals in January 1997.

### A.   Refusal to Hire Self-Identified Union Members

In December 1996, three union members delivered completed applications to Masiongale's superintendents at the Mishawaka jobsite. They identified themselves as union organizers and discussed their work experience and certifications with the superintendent. Though the superintendents told these applicants that the jobsite was in need of plumbers and they submitted completed applications indicating that they were voluntary union organizers, they were never contacted by the company. In August 1997, four different union members went to Masiongale's office and requested job applications, which they completed on the spot. They wore union T-shirts and

wrote the phrase "Voluntary Union Organizer" at the top of their applications. They submitted their applications to Masiongale's receptionist, but were never contacted by the company.

On March 28, 1997, Jack Neal submitted 13 completed applications, along with his own, to Masiongale's office. All the applicants held valid plumber's licenses and had written the phrase "Voluntary Union Organizer" across the top of their applications. None of the 13 applicants were contacted by Masiongale for work on either job site, though Neal, after a follow-up telephone conversation, was offered a position in April.

B.   Gary Gravit and Jeffrey Jehl

Gary Gravit applied for a job as a plumber at the Mishawaka jobsite in December 1996. He met a superintendent, Ron Curd, and was offered a position. The morning of his first day at the jobsite, Gravit met with Jeffrey Jehl, an organizer for the union, and they both went to the jobsite. Gravit introduced Jehl to Curd and told Curd that though Jehl did not have a plumber's license, he was experienced and would do good work. Jehl filled out a job application and was hired on the spot. Neither Gravit nor Jehl revealed their union affiliation on their job applications or while talking with Curd.

Their first morning at work, Gravit and Jehl observed two people with jackets bearing union insignia talking to Curd. After the two individuals left, Curd approached Jehl and Gravit and asked whether either of them knew the two union members. Gravit said that he knew one of the employees. Curd then turned to walk away, but returned and asked, "Have either of you been a member of the union before?" Gravit said he "worked permit" a couple of times in the past, and Jehl said that he was never a member of Local 172.

The next morning, Gravit and Jehl began distributing union literature and discussing the union with the employees on the jobsite. Jehl wore a white jacket with a union organizer logo on it and Gravit wore a Local 172 baseball hat. Curd arrived at the job site a little while after Gravit and Jehl began talking with other employees, and was told by Jehl that he was a organizer for the union. Curd replied that he was not surprised, and said "If Masiongale had to pay union wages, they might as well pull off the job, they would go broke."

Gravit told Jehl while they were working on the jobsite that Masiongale was not completing some of the plumbing up to code. Instead of telling Curd, Gravit decided he would send a letter to the plumbing inspector. They then met with Curd and told him that they felt that they were underpaid compared to other plumbers on the jobsite. Curd replied by telling them that he could not grant wage increases. Jehl said that until he was given a raise, he was going on strike. Curd asked, "Are you both union members?" and they replied "Yes." Curd then asked, "Are you both going out on strike?" Gravit replied "Yes." Both left the jobsite and did not return to work. Gravit then sent his letter to the plumbing inspector describing the code violations he noticed on the jobsite.

Jehl and other union organizers had several meetings with Curd over the next two months discussing the union's picketing of the jobsite and other matters. In March 1997, after learning from his last conversation with Curd that the jobsite was in dire need of help, Jehl went to the jobsite and told Curd that he would unconditionally return to work. Curd began to laugh, saying that Jehl was not allowed on the project, and that "around here you are considered a marked man, everyone on the job has a hunting license and shotguns." Jehl left the jobsite and wrote a letter to Masiongale reiterating his offer to uncon-

ditionally work on the jobsite, but never received a response.

C.  Jack Neal and Anthony Bane

As mentioned above, Jack Neal was the business agent for Local 661, and distributed copies of Masiongale's job application to unemployed union members in January 1997. Shortly thereafter, Neal saw a different Masiongale advertisement and called the company. He was asked whether he had a plumber's license and was encouraged to pick up an application. In March, 1997, Neal delivered his completed application to Masiongale's office, along with 13 other applications. He called Masiongale's office two weeks later regarding his application and was put in contact with the supervisor at the Greenwood jobsite, Michael Woods. Woods asked about his plumber's license and prior experience, asked for his driver's license number to do a background check, and offered him a position beginning that next Monday. Neal told Woods about a friend, Anthony Bane, who also had a plumber's license and was looking for work. Woods asked Bane to call him, and after Woods asked about Bane's plumber's license, experience, and driver's license number for a background check, Woods also offered Bane a position beginning that next Monday. Neither Neal nor Bane told Woods that they were union members.

The next Monday morning, Woods asked Neal and Bane to fill out job applications and other paperwork, telling them that plumbers were needed for the 18-month job. Bane listed the union's apprenticeship program on his job application, but Woods did not look over the applications before telling Neal and Bane to report to their foreperson on the jobsite.

Before Neal and Bane left Wood's office to report to their foreperson, Bane told Woods that he and Neal were

union organizers. Woods's demeanor apparently changed dramatically, as he slammed both hands down on his desk and told Neal and Bane to "sit in your truck until Mike Masiongale comes to the jobsite." As they were leaving the office, Neal and Bane saw Woods make a telephone call. Woods then came to Neal and Bane's truck and told them that Masiongale's standard hiring procedure was to have a private detective conduct a background check before people were hired. Neither Bane nor Neal had previously been informed of a background check that required more than their driver's license numbers. Bane and Neal reminded Woods of their conversations with him earlier, but Woods said, "Well, that is just part of it." Bane told Woods as they were leaving the jobsite that they were there to do a good job, to which Woods replied, "no you didn't, you are here to screw up my operation."

Bane telephoned Masiongale's office when he returned home that day and scheduled an appointment to meet with the private detective, which he had to cancel due to a prior commitment. A second appointment was canceled by the company, and Bane never heard anything else about the background check or resuming work on the jobsite.

Neal met with the private detective for about 30 minutes and was asked about his union background and affiliation. He did not hear anything from Masiongale for three weeks, so he called Masiongale's office, and was told that they did not think he was still interested in a job. He said that he was still interested, and he was contacted the next day by a superintendent, John Blevins, who asked that he come to Masiongale's office. Neal showed up at the office wearing a union T-shirt, and was asked to fill out additional paperwork and watch a safety film. He was offered $13 an hour instead of the earlier $14 offer. Neal then met with Mike Masiongale, who told Neal that he did not like Neal wearing the union T-shirt. Blevins

then told Neal that he would not be going to a jobsite, but would be working out of the office's shop putting together shower faucet heads. Neal was shown the office's storage garage and was told that it would be his workspace. After space was cleared out of the garage for him and a workbench improvised out of sawhorses and plywood, Neal told Blevins that he could not find any shower faucets. Blevins said that he would order some and asked Neal to cut some copper pipe.

After Neal had begun cutting the pipe, Blevins and Mike Masiongale approached Neal, with Masiongale saying "that he did not want [Neal] talking about the union to his employees, handing out literature, and did not want him to talk to his employees about the Union on the job, in his office, or on his property." Mike Masiongale also said that "he did not want the union, they messed with me before." Neal told Blevins that Mike Masiongale did not have the right to talk to him that way, and that he was going on strike, packing his tools, and leaving the garage. The next day, Neal returned to the garage to find that it was being used for storage and no one was working there. Neal called Blevin and Woods, but none of his calls were returned.

D.  Procedural History

The General Counsel of The Board issued a complaint against Masiongale, alleging violations of §§ 8(a)(3) and (1) of the Act, 29 U.S.C. §§ 158(a)(3) and (1), based on the coercion of Gravit and Jehl, the termination of Bane, the sequestration of Neal, and its failure to hire the 20 self-identified union organizers. The complaint alleged that Masiongale acted against these individuals because of their membership in the union. An administrative law judge conducted a hearing and recommended that the Board find the claims meritorious. The Board agreed

with the ALJ's findings regarding coercion and work restrictions, making only minor alterations to the ALJ's proposed order. *See Masiongale Elec.-Mech., Inc.*, 331 N.L.R.B. 67 (2000). However, it remanded the refusal-to-hire claim back to the ALJ to incorporate the Board's newly-issued framework described in *FES, (A Division of Thermo Power)*, 331 N.L.R.B. 20 (2000), *enforced by NLRB v. FES, (A Division of Thermo Power)*, 301 F.3d 83 (3d Cir. 2002). On remand, the ALJ issued a supplemental decision finding that Masiongale violated §§ 8(a)(3) and (1) of the Act when it refused to hire or consider for hire the 20 job applicants. The Board adopted the ALJ's findings and the proposed order. *See Masiongale Elec.-Mech., Inc.*, 337 N.L.R.B. 4.

Masiongale petitions for review of both the original order and the supplementary order, and the Board cross-appeals for enforcement of both orders. On our own motion, we consolidated these cases.

## II.  ANALYSIS

We enforce orders of the Board if its factual findings are supported by substantial evidence and its legal conclusions have a reasonable basis in law. *See* 29 U.S.C. § 160(e); *Multi-Ad Servs., Inc. v. NLRB*, 255 F.3d 363, 370 (7th Cir. 2001). There is substantial evidence if there is relevant evidence that a reasonable mind might accept as adequate to support the Board's conclusion. *See NLRB v. Clinton Elecs. Corp.*, 284 F.3d 731, 737 (7th Cir. 2002); *Nat'l By-Prods., Inc. v. NLRB*, 931 F.2d 445, 451, 137 L.R.R.M. (BNA) 2275 (7th Cir. 1991). When reviewing the record, we defer to the Board's inferences and conclusions drawn from facts, *Clinton Elecs.*, 284 F.3d at 737; *U.S. Marine Corp. v. NLRB*, 944 F.2d 1305, 1314 (7th Cir. 1991) (*en banc*), but must make sure that the Board's findings fairly and accurately represent the record. *See NLRB*

*v. Harvstone Mfg. Corp.*, 785 F.2d 570, 575 (7th Cir. 1986). We particularly defer to the Board's findings regarding witness credibility, disturbing them only in extraordinary circumstances, *e.g.*, clear bias by the ALJ, disregard of sworn testimony, or acceptance of testimony that is facially not credible. *Multi-Ad*, 255 F.3d at 370 (citing *NLRB v. Gerig's Dump Trucking, Inc.*, 137 F.3d 936, 941 (7th Cir. 1998)). If we are faced with two conflicting versions of an incident, the ALJ's determinations are entitled to deference. *Multi-Ad*, 255 F.3d at 370; *Van Vlerah Mech., Inc v. NLRB*, 130 F.3d 1258, 1263 (7th Cir. 1997).

A.   Failure to Hire Twenty Self-Identified Voluntary Union
     Organizers

Masiongale argues that the Board's finding that it refused to hire 20 union members due to anti-union animus is erroneous because Masiongale had valid reasons for not hiring the applicants, satisfying its burden according to the Board's new standards described in *NLRB v. FES, (A Division of Thermo Power)*, 301 F.3d 83 (3d Cir. 2002) (enforcing *FES, (A Division of Thermo Power)*, 333 N.L.R.B. 20 (2000)). In addition, it argues that the Board's remedial order overreaches since there was no showing that there were enough openings to accommodate the rejected applicants to have filled, a requirement we established in *Starcon, Inc. v. NLRB*, 176 F.3d 948 (7th Cir. 1999). However, given our deference to the Board, especially when judging witnesses' credibility, we find that there is substantial evidence to support the Board's findings and enforce its order with regards to these un-hired applicants.

In *FES*, the Board described a new burden-shifting framework to determine whether an employer violated § 8(a)(3) of the Act by refusing to hire an applicant because of anti-union animus. This modified the previous test

outlined in *NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393 (1983) (established by *Wright Line, a Div. of Wright Line, Inc.*, 251 N.L.R.B. 1083 (1980), *enforced by* 662 F.2d 899 (1st Cir. 1981)). This change responded to numerous criticisms of the *Wright Line* test, *see FES*, 333 N.L.R.B. 20, at *2-3 (summarizing cases), including our own concern that a prima facie refusal-to-hire case could be shown under the *Wright Line* framework in a mixed-motive case even though the applicants were not otherwise qualified for the sought-after position. *See Starcon*, 176 F.3d at 950-52.[1] As described in *FES*, a prima facie refusal-to-hire case consists of showing:

(1) that the respondent was hiring, or had concrete plans to hire, at the time of the alleged unlawful conduct;

(2) that the applicants had experience or training relevant to the announced or generally known requirements of the positions for hire, or in the alternative, that the employer has not adhered uniformly to such requirements, or that the requirements were themselves pretextual or were applied as a pretext for discrimination; and

---

[1] We used the following example:

Suppose that one of the [applicants] for a job as a welder on one of Starcon's turnaround projects was in fact a penguin wearing a [union] button. If Starcon turned down the penguin's application, *and* there was proof that Starcon would never hire anyone wearing a [union] button, . . . it would be open to Starcon to prove that, in any event, it would never hire a penguin, because penguins can't weld. But the burden of proving this would be on Starcon. We don't see why the Board would have the burden of proving (if it could) that Starcon would hire nonunion penguins.

*Starcon*, 176 F.3d at 951.

(3) that antiunion animus contributed to the decision not to hire the applicants.

*FES*, 301 F.3d at 87. Once a prima facie case is established, it is the respondent's burden to show that it would not have hired the applicants even absent their union activity or affiliation. *See id.* We think that this framework addresses the concerns we described in *Starcon*, and concur with the Third Circuit's approval of this test. *See id.*[2]

To apply this framework, Masiongale's anti-union animus must be demonstrated in connection with the decision to not hire all 20 applicants to present a prima facie refusal-to-hire case. *See FES*, 301 F.3d at 87. We agree with the Board that there is substantial evidence of animus, given the statement of Ken Masiongale, president of the company, who told Neal that "he did not want the union, they messed with me before" when Neal was being sequestered in the company's storage garage, and Woods's telling Bane that "You came to screw up my operation." Masiongale does not contest these and other statements displaying anti-union animus, nor does it dispute that the 13 plumbers who applied as a group by submitting their forms were licensed and therefore qualified to do the job advertised by Masiongale. Therefore, we find that a prima facie case of refusing to hire based on anti-union animus was presented to the Board under the *FES* framework.

---

[2] Because the Board's decision in *FES* was released after the ALJ issued his opinion in this case, the Board remanded the case back to the ALJ regarding these refusal-to-hire claims in order to take into account *FES*. Finding that he was able to apply the *FES* standard without taking additional evidence, the ALJ issued a supplementary order, which was adopted by the Board. *See Masiongale Elec.-Mech.*, 337 N.L.R.B. 4 (2001).

Masiongale argues that the 13 applicants whose forms were submitted *en masse* by Thomas Neal were summarily rejected because the applications were stale, not because of anti-union animus. Masiongale's application form states above the signature line that "this application will be considered active for a period of 30 days only," and Masiongale argues that since the forms were completed and dated January 1997, but not submitted to Masiongale until March 1997, the forms were stale when they were submitted and therefore not eligible for consideration. The rationale for not using old applications is straightforward—in an industry like construction, where work schedules are transitory, an applicant who submitted an application in April may have found work by June or July, making reliance on such applications an inefficient use of time.

A majority of the Board, however, found that the application of the 30-day rule was ambiguous. Masiongale maintains that the time period begins running from the day the form is competed, since it believes that applicants only fill out forms when they are immediately available for work. The Board noted that this is not apparent from the language of the form and does not consider the possibility that applicants may plan ahead in their job search, *i.e.*, that applicants may complete the form in advance and have it ready and waiting when they begin looking for a new job. Whatever the interpretation of the 30-day rule, the Board found that Masiongale did not rely on the application process to hire new employees, and that it was a pretextual reason for rejecting those applicants that it did not want.[3] The Board agreed with the ALJ's

---

[3] Masiongale claims that because these applications were untimely, the applicants could not show that they met the positions' requirements, thereby failing to meet the second re-
(continued...)

finding that Ken Masiongale's testimony regarding the company's interpretation of the 30-day policy was not credible and cited numerous instances of hiring that took place without the benefit of an application. Several times, union representatives called Masiongale supervisors to recommend plumbers they knew were unemployed at the time. Every time, the recommended plumber was hired after arriving on the jobsite or at Masiongale's offices without prior review of a written application. While Masiongale emphasizes its belief that the 30 days should start from the date of the application's completion, not its submission to Masiongale, it offers no counter to the Board's finding that the requirement was a pretextual one disguising anti-union animus.

Masiongale also argues on appeal that there was no showing that there were enough vacancies at the time for the applicants to fill, making modification of the Board's order warranted insofar as it orders instatement of the

---

[3] (...continued)

quirement of a prima facie case under *FES*. This misreads the requirement, which only asks whether "the applicants had experience or training relevant to the announced or generally known requirements of the positions," or that these requirements were pretextual. *FES*, 301 F.3d at 87. These requirements must be "based on nondiscriminatory, objective, and quantifiable employment criteria." *Id.* at 91. Since the advertisements only asked for licensed plumbers and assistants, these were the only objective criteria needed to evaluate the applicants for purposes of testing the Board's prima facie case. Given the ambiguous interpretation of the timely application requirement, it was Masiongale's burden to show that the applicants failed to satisfy that requirement, *id.* at 91-92, and we defer to the Board's determination that Masiongale failed to adequately show that this was in fact a requirement, and that it was not met by these applicants.

13 applicants. As we said in *Starcon*, the Board must demonstrate that at least one such applicant would have been hired, but only one, in order to establish a violation of the Act. *See Starcon*, 176 F.3d at 951. Since the Board is bringing the claim, not the spurned applicant, a one-for-one correlation is not necessary to establish a violation. *See id.* However, *Starcon* also requires the Board to show that positions were available for every rejected applicant if the cease and desist order includes, as here, relief directed at individuals. *See id.* While this argument may have merit, Masiongale never included this in its statement of objections to the ALJ's original or supplemental decisions. Because Masiongale failed to present this objection to the Board, it is waived for purposes of appeal, and we need not consider it. *See NLRB v. Howard Immel, Inc.*, 102 F.3d 948, 951 (7th Cir. 1996); *NLRB v. Augusta Bakery Corp.*, 957 F.2d 1467, 1478 (7th Cir. 1992); 29 C.F.R. §§ 46(b), (h).

In addition to the 13 applicants who submitted their forms as a group, the Board found that Masiongale violated § 8(a)(3) by refusing to hire the seven union members who contacted the company individually and submitted application forms in person. Masiongale claims that it did not hire these applicants because of its "wage history" rule, *i.e.*, it believed that it is undesirable to hire workers accustomed to receiving a higher hourly wage than Masiongale would offer, since these workers would leave for a better-paying job as soon as one was available, the employee would not do a good a job, and additional time would be spent negotiating wage rates. The Board found the wage history rule a pretextual qualification used to justify not hiring union-affiliated applicants, pointing out instances when Masiongale hired non-union applicants whose prior wage history included jobs paying higher rates than Masiongale's rates.

Masiongale contests the accuracy of these comparisons, but we need not resolve this factual debate. Here, the Board's findings are not an inaccurate distortion of the record. *See Multi-Ad*, 255 F.3d at 370. While we note the contested versions of the wage history for non-union-affiliated applicants and defer to the Board's view, we also note that one of the two application forms submitted to the ALJ does not ask for an applicant's wage history. Because the four August 1997 applicants used the form with no space for wage history, we find it difficult to see how they could be rejected because of their prior wage history, and see this as further evidence of the requirement's pretextual nature. Therefore, we agree with the Board that there was sufficient evidence to conclude that Masiongale's wage-history rule was pretextual and that the seven applicants were not considered because of Masiongale's anti-Union animus. We accordingly enforce the portion of the order regarding these 20 applicants.

## B.   Gary Gravit and Jeff Jehl's Coercion

The ALJ and the Board found that Curd's interrogation of Gravit and Jehl violated Section 8(a)(1) of the Act, 29 U.S.C. §158(a)(1), which forbids an employer from interfering with, restraining, or coercing employees who exercise their right to self-organization. 29 U.S.C. § 157. This right includes freedom from employers coercively interrogating employees to discourage union activities. *See Multi-Ad*, 255 F.3d at 371 (*citing Van Vlerah*, 130 F.3d at 1262). The Board found that there was substantial evidence that Curd interrogated Gravit and Jehl when, after Curd had talked with two individuals wearing union jackets, he asked Gravit and Jehl if either of them knew the individuals, and then inquired if Gravit and Jehl belonged to the union. Curd also was found to have coercively interrogated Gravit and Jehl when he asked them,

after they announced that they were striking for better wages, "are you both union members and are you both going out on strike?"

In *Multi-Ad*, we described our concerns regarding whether an interrogation is coercive, noting that:

> The test is not whether coercion actually occurred, but only whether the employee perceived the employer's actions to be coercive. Factors that ought to be considered in deciding whether a particular inquiry is coercive include the tone, duration, and purpose of the questioning, whether it is repeated, how many workers are involved, the setting, the authority of the person asking the question, and whether the company otherwise had shown hostility to the union. We also consider whether questions about protected activity are accompanied by assurances against reprisal and whether the interrogated worker feels constrained to lie or give noncommittal answers rather than answering truthfully.

*Multi-Ad*, 255 F.3d at 372 (internal citations omitted).

We do not find that Curd's questioning of Gravit and Jehl was coercive in a manner that violated the Act. Curd's questions do not suggest an intent to force Gravit and Jehl to compromise the union or any plans they may have had as union representatives. His first questions were simple and direct, and after Gravit and Jehl answered him, he left them to work, making no comments about how he felt about the union or his reaction to the two union representatives that he had talked to earlier. Similarly, Curd's questions to Gravit and Jehl, after they told him they were going on strike, reflect an attempt to clarify the situation, since he did not know until then that the two were union members. Gravit and Jehl gave no indication that they were members during the applica-

tion process, and it was not evident that they were union members until their second day of work, when they wore their union jackets and passed out literature. Also, Curd never gave any hint of reprisal in his questioning. Even though Masiongale's position regarding the union was apparent, and there was an informational picket set up next to the jobsite by one of the union's locals, such factors do not automatically make any questioning regarding union matters coercive. Section 8(c) of the Act allows employers to express "any views, argument, or opinion, or the dissemination thereof" so long as "such expression contains no threat of reprisal or force or promise of benefit." 29 U.S.C. § 158(c). Because these views can include organized anti-union campaigns, *see Beverly Cal. Corp. v. N.L.R.B.*, 227 F.3d 817, 832 (7th Cir. 2000), to consider Curd's questioning of Gravit and Jehl coercive under § 8(a)(1) of the Act would gut the First Amendment freedoms protected by § 8(c).

We take a different view regarding Curd's comments to Jehl when Jehl attempted to return to the jobsite after going on strike. Upon learning that the jobsite was in need of help, Jehl returned to the site and offered his unconditional services to Curd, who laughed and said, "around here you are considered a marked man, everyone on the job has a hunting license and shotguns." Masiongale argues that employers have greater latitude when questioning organizers like Jehl and Gravit, as compared to ordinary employees, since they are less likely to submit to coercion, citing *Rossmore House*, 269 NLRB 1176 (1984), *enforced* 760 F.2d 1006 (9th Cir. 1985). That union organizers have a thicker skin when it comes to treatment by employers does not mean that we can tolerate threats of violence directed against them. While the threat may have been in jest or not taken seriously by Jehl, when statements can have multiple interpretations, we defer to the ALJ's interpretation, and therefore enforce this portion of the order. *See Multi-Ad*, 255 F.3d at 370.

C.  Jack Neal and Anthony Bane's Application Process

Masiongale argues that Bane was not discharged as a result of anti-union animus because Bane was never hired in the first place. The ALJ found that Bane was discharged when Masiongale failed to schedule a follow-up appointment with its private detective after the detective canceled the appointment. Masiongale argues that since the interview with the detective was a part of the application process, and Bane never completed that process, he was never employed. Indeed, Masiongale claims that Bane had an obligation to contact the company and schedule another appointment, and failure to do so was evidence of his disinterest in the position.

We need not mull over whether or not Bane was hired by Masiongale, given the Board's findings regarding the interview requirement itself. The Board adopted the ALJ's finding that Masiongale violated § 8(a)(1) of the Act when it suddenly required the interview with a private detective, describing it as part of the job application process. Given the Board's view of the interview as a necessary pre-requisite to employment, Bane could not have been hired by Masiongale because he did not complete the (suddenly changed) application process. This is a pyrrhic victory for Masiongale, however, because we only come to our quick conclusion due to Masiongale's failure to object to the Board's finding that the interview requirement itself was imposed due to anti-union animus. Because Masiongale has waived any appeal regarding the interview requirement, we summarily enforce this portion of the Board's order. *See Beverly Cal.*, 227 F.3d at 831.

Masiongale has likewise waived any appeal of the Board's finding that Neal was sequestered from other employees to prevent him from engaging in union activities, a violation of § 8(a)(1) of the Act. Neal revealed that he was a union organizer, and having met with the detec-

tive, reported for work. Instead of reporting to the jobsite, he was ordered to do what can only be described as busy-work tasks, told not to wear clothing bearing union insignia and not to discuss union activities with anyone on company property or company job sites. Since Masiongale does not contest these findings, the Board is entitled to summary enforcement of its order regarding Neal's sequestration and restrictions of discussing union activities as well. *See id.*

## III.  CONCLUSION

For the reasons stated above, the Board's orders are ENFORCED in part, VACATED in part, and remanded for further proceedings consistent with this opinion.

A true Copy:

      Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*