# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

Nos. 01-3765 & 02-1226

FLEMING COMPANIES, INC., MEMPHIS
GENERAL MERCHANDISE DIVISION,

*Petitioner/Cross-Respondent*,

*v.*

NATIONAL LABOR RELATIONS BOARD,

*Respondent/Cross-Petitioner.*

_____

Petitions for Review and Cross-Application
for Enforcement of an Order of the
National Labor Relations Board.

_____

ARGUED SEPTEMBER 26, 2002—DECIDED NOVEMBER 18, 2003

_____

Before COFFEY, ROVNER, and DIANE P. WOOD, *Circuit Judges.*

ROVNER, *Circuit Judge.* In 1997, employees of a warehouse in Memphis, Tennessee, began a union organizing drive in preparation for an election to determine if there was sufficient support for a union at the warehouse. The union filed a complaint with the National Labor Relations Board ("Board") against the owner of the warehouse, Fleming Companies, Inc., Memphis General Merchandise

Division ("Fleming"), alleging that Fleming committed several unfair labor practices that resulted in the union losing the election. The Board then brought a complaint against Fleming. An administrative law judge ("ALJ") conducted a hearing and found that Fleming had violated several provisions of the National Labor Relations Act and issued a cease and desist order. Fleming appealed the ALJ's decision, but the Board affirmed the ALJ's rulings, findings of fact, and conclusions, and adopted his recommended order.

Fleming has now appealed three of the ALJ's findings to this court: (1) that Fleming violated 29 U.S.C. § 8(a)(1) by threatening employees that it would impose more stringent working conditions and would start enforcing company rules because of union organizing activity; (2) that Fleming violated § 8(a)(1) by unlawfully threatening employees with plant closure if the employees selected the union to represent them; and (3) that Fleming violated § 8(a)(1) by removing union literature from an employee bulletin board and by threatening an employee with discipline for posting union literature on it. The Board cross-applied for enforcement of the NLRB's order. We affirm in part, and reverse in part.

Fleming is a wholesale grocery distribution company that operates a warehouse in Memphis.[1] In January 1997, some employees began a union organizing drive at the warehouse. On February 5, two employees, one of whom was Duc Le, had a conversation on the warehouse floor about paying union dues. Shortly afterwards, the manager of Human

---

[1] The background summary contained in this section of the opinion is based on the findings of fact made by the ALJ, which were affirmed by the Board. There were numerous allegations of unfair labor practices, but we will discuss only those that are relevant to the determination of this appeal.

Resources, Danny Gaither, confronted Le while he was working in the lift room. Gaither pointed his finger at Le and said, "Don't talk about this Union shit. I know how to take care of you."

On that same day, Gaither observed two employees—both stockers—punch their timecards before their shifts started. Fleming's company policies allow employees to punch into work only within five minutes before their shift starts. Fleming programs the time clock closest to the employees' work stations with their schedule and then the time clock will reject any request to punch in outside of the employees' schedule. The warehouse has four time clocks and only the one closest to the employee's work station is programmed with their schedule, so employees can punch in early if they use one of the unassigned time clocks. The two employees observed by Gaither had punched in 15 minutes and 10 minutes early by using an unassigned time clock. Gaither also observed the same two employees sitting in the break room after their shift had started. Fleming has a policy that prohibits employees from being in the break room at any time other than during their assigned breaks.

Gaither was with another Fleming employee, Mitch Zweig, when he observed these infractions. Zweig was the leadperson for the stockers and reported to the warehouse managers. Gaither decided that both employees should receive a written disciplinary warning for these infractions, and Zweig volunteered to inform the employees of the reprimand. While talking to Vessie Reynolds, one of the employees to be disciplined, Zweig told her that Gaither "had to bust up that thing down there in the lift room." Zweig warned that Gaither was "on the warpath" and that the "union stuff" had management "stirred." Zweig then told Reynolds that the warehouse manager was "printing up a letter about punching in on the right clock so nobody can get in early" and added that Fleming would also be "looking

at breaks." The next day, the warehouse manager issued a memo reminding employees to utilize their "home" clocks and not to expand their break periods.

On March 19, a forklift driver, Stanley Jones, brought pro-union flyers to work and posted one of them on a break-room bulletin board. Jones also posted a flyer on the break-room door and left several flyers on the table and chairs. The flyer was entitled, "35 Things Management Cannot Do!" Shortly after Jones put up the flyers, an employee saw Zweig remove them and ball them up in his hand. Later that day, Zweig and Gaither confronted Jones in front of his coworkers and told him that Fleming did not allow any material on the bulletin boards except for company business. Gaither told Jones, "If we catch you placing information or materials on our boards or walls, we will have to take disciplinary action including up to termination." Before this incident, no employee had ever been disciplined for posting items on the bulletin boards.

The union continued to pursue organization of the warehouse and an election was set for June 4 to determine if there was sufficient support for the union. Prior to the election, Fleming's division president, Russ Hill, held a series of mandatory "Save Fleming" meetings with employees. At one of these meetings, on June 3, several employees claim that Hill warned a group of about 100 employees that if they voted for the union, Fleming would be financially damaged and the Memphis warehouse might close down. The election took place the next day, and the union did not receive a majority of the vote.[2]

---

[2] Due to the Board's finding that Fleming committed unfair labor practices, the NLRB ordered a rerun of the election, but the election has been stayed pending the resolution of this litigation.

**ALJ's Decision**

In 1998 an ALJ presided over a seven-day trial at which many employees testified, including Le, Reynolds, Jones, and Gaither. The ALJ found that Zweig's comments to Reynolds on February 5 were coercive because they were made in order to threaten more stringent working conditions due to the union campaign. The ALJ specifically pointed to Zweig's comments that it was the management's concern over this "union stuff" that was the cause of them "looking at breaks" and "printing up a letter about punching in on the right clock."

The ALJ also found that division president Hill impermissibly threatened the closure of the plant the day before the union election took place. Two employees testified that Hill told them that if they voted for the union, the warehouse "would go in the hole." The two employees' testimony differed in one respect—one testified that Hill said the plant "would" close if the union won the election, and the other testified that Hill said the plant "could" close. A distribution manager also testified about the content of Hill's speech, but he claimed that Hill never mentioned the closing of the plant. The ALJ credited the employees' testimony over the manager and found that the slight difference in words by the witnesses did not alter the basic message of Hill's speech—that a vote for the union would put the future of the warehouse, and the employees' jobs, at risk. Thus, the ALJ found that Hill's speech violated § 8(a)(1).

Finally, the ALJ found that Fleming impermissibly prohibited the posting of union materials on company bulletin boards. Fleming's company handbook states that the bulletin boards are "for company business purposes only." However, the ALJ found that in practice, Fleming allowed personal postings by employees and would remove them only after they had been posted for anywhere from several

days to several months. Employees posted wedding invitations, announcements, thank-you cards, birthday cards, sympathy notes and notices of personal items for sale, but there was no evidence of any commercial or organizational material. The ALJ found that because Fleming "permitted employees to post personal items," it was required to allow union postings. Fleming appealed three issues to a three-member panel of the National Labor Relations Board, which affirmed the ALJ's decision.

## Discussion

We will uphold a Board order if there is substantial evidence in the record to support its findings of fact and if its conclusions of law have a reasonable basis in the law. *Huck Store Fixture Co. v. NLRB*, 327 F.3d 528, 553 (7th Cir. 2003); *see* 29 U.S.C. § 160(e), (f). Substantial evidence is relevant evidence such that a reasonable mind might accept as adequate to support a conclusion. *NLRB v. Clinton Elecs. Corp.*, 284 F.3d 731, 737 (7th Cir. 2002). We do not engage in our own fact-finding or supplant the Board's reasonable conclusions "simply because we would have come to a different conclusion if we reviewed the case *de novo.*" *Livingston Pipe v. NLRB*, 987 F.2d 422, 426 (7th Cir. 1993). However, we can set aside a Board decision if we cannot "find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view." *J.C. Penney Co. v. NLRB*, 123 F.3d 988, 993 (7th Cir. 1997) (citation omitted).

Section 7 of the NLRB provides that "[e]mployees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . ." 29 U.S.C. § 157.

Section 8(a)(1) of the NLRB considers it an unfair labor practice for an employer to restrain, coerce, or interfere with employees in their exercise of the rights conferred in § 7. 29 U.S.C. § 158(a)(1). "Threats of discharge, discipline, plant closure or other reprisals against employees for engaging in union activity are unlawful and violative of section 8(a)(1) of the Act because these acts reasonably tend to coerce employees in the exercise of their rights, regardless of whether they do, in fact, coerce." *N. Wire Corp. v. NLRB*, 887 F.2d 1313, 1318 (7th Cir. 1989). It is also settled that a coercive threat may be implied rather than stated expressly. *See Nat'l By-Products, Inc. v. NLRB*, 931 F.2d 445, 451-52 (7th Cir. 1991) (quoting *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 617-18 (1969)).

Fleming first challenges the ALJ's finding that it threatened stricter enforcement of company rules in response to union organizing. Fleming argues that leadperson Zweig was not functioning as Fleming's agent at the time he made the allegedly threatening comments to Reynolds. To hold an employer liable, the individual who made the statement must act as an agent of the employer. 29 U.S.C. § 152(2); *see also NLRB v. Thermon Heat Tracing Servs., Inc.*, 143 F.3d 181, 186 (7th Cir. 1998). An agent has apparent authority when an employer takes steps that would reasonably lead third persons to believe that the designated employee was authorized to take certain actions on behalf of the employer. *See* Restatement (Second) of Agency, § 27. In determining whether an agent has apparent authority, the Board considers "whether, under all circumstances, the employees would reasonably believe that the employee in question was reflecting company policy and speaking and acting for management." *Einhorn Enters., Inc.*, 279 N.L.R.B. 576, 580 (1986).

Substantial evidence supports the Board's finding that Fleming's conduct could reasonably lead employees to be-

lieve that Zweig was speaking and acting for management. The Board relied on evidence that when Fleming announced to the stockers that Zweig had been promoted, they introduced him as a "supervisor." The record reveals that Fleming informed employees that Zweig was a "Team Leader," and Gaither testified that Team Leaders have a "leadership position" with the company. The employees who testified before the ALJ stated that they "reported to Zweig" and took orders from him. The Board found that Zweig directed other employees' work, investigated employee conduct, and gave written reports of disciplinary incidents to higher management. Furthermore, the Board found that Zweig's conversation with Reynolds was done "at the direction of higher management." Therefore, we sustain the Board's conclusion that Zweig was an agent of Fleming.

Fleming also argues that the context of Zweig's conversation with Reynolds shows that his statements were not threatening and did not interfere with the employees' exercise of their rights. Fleming argues that Zweig merely informed Reynolds of the reprimand and reminded her of existing policies. The ALJ held that a reasonable employee would infer that management was planning to enforce time clock and break-time rules more strictly because they were "stirred" by "this Union stuff."

An employer violates § 8(a)(1) of the Act by threatening an employee with stricter enforcement of company rules and other unspecified reprisals due to a union campaign. *See NLRB v. Shelby Mem'l Hosp. Ass'n,* 1 F.3d 550, 564 (7th Cir. 1993). Whether a threat of discipline was made is a finding of fact within the Board's expertise. *NLRB v. Champion Lab, Inc.,* 99 F.3d 223, 228 (7th Cir. 1996). In determining whether an employer's statement is coercive, we consider "whether an employer's actions had a reasonable tendency to interfere with or coerce employees." *NLRB v. Joy Recovery Tech. Corp.,* 134 F.3d 1307, 1313 (7th Cir.

1998). Fleming is correct that whether an employer's statements to an employee are coercive depends on the factual context in which the statement is made. *See Shelby Mem'l Hosp. Ass'n*, 1 F.3d at 559.

We uphold the ALJ's decision on this point because it is based upon substantial evidence. Reynolds testified that Zweig told her that Gaither was on the "warpath" following the "thing down there in the lift room" and that management was "going to be looking at breaks." Then Zweig told Reynolds that management would begin strictly enforcing rules as to clocking in and using the break room. The ALJ found that "the overall statement was coercive" because a reasonable interpretation of the conversation would lead an employee to believe that these rule enforcements were being done because of union organizing. Fleming also argues that Zweig never explicitly stated that Fleming would alter its policies or enforce them in a discriminatory manner, but this argument fails because express threats are not necessary to violate § 8(a)(1). *See Nat'l By-Products, Inc.*, 931 F.2d at 451. Fleming's argument boils down to a request that we reweigh the evidence ourselves, but that role is best left to the Board. Accordingly, we sustain the Board's decision.

Fleming next argues that substantial evidence does not support the Board's conclusion that Fleming threatened to close the Memphis warehouse. A threat of plant closure is a *per se* violation of § 8(a)(1). *See Multi-Ad Servs., Inc. v. NLRB*, 255 F.3d 363, 373 (7th Cir. 2001). In this case, two employees testified that division president Hill said that the warehouse "would" or "could" close if the employees voted for the union. The ALJ credited the employees' account of the speech over that of the manager, and we will reject credibility findings only under extraordinary circumstances. *Masiongale Elec.-Mech., Inc. v. NLRB*, 323 F.3d 546, 551 (7th Cir. 2003). This evidence is sufficient to establish a

violation. *See Gissel Packing Co.*, 395 U.S. at 618-19 (employer unlawfully threatened that unionization "will or may" result in plant closing); *Cent. Transp., Inc. v. NLRB*, 997 F.2d 1180, 1189 (7th Cir. 1993) (employer unlawfully said that facility might possibly close).

Finally, Fleming appeals the Board's conclusion that it violated § 8(a)(1) by removing union flyers from the bulletin board in the break room. Fleming argues that it had a valid, pre-existing policy prohibiting unapproved postings on company bulletin boards. Fleming has a rule in its employee handbook restricting the bulletin boards to company use and prohibiting employees from posting any personal announcements. Fleming contends that there was substantial evidence that the policy was consistently and uniformly enforced and that items that violated the stated policy were removed.

The ALJ found that Fleming's written policy was contradicted by its practice of permitting employees to post personal items—notices of weddings or births—on the bulletin boards. The ALJ also found that Fleming consistently excluded any posting of group or organizational notices. The ALJ concluded that because Fleming "permitted employees to post personal items," it was required to allow union postings.

An employer has the right to restrict access to its bulletin boards. *J.C. Penney*, 123 F.3d at 997; *Guardian Indus. Corp. v. NLRB*, 49 F.3d 317, 318 (7th Cir. 1995). An employer, however, cannot discriminate against a union's posted material by disparately applying its posting policy to hinder the union's efforts. *J.C. Penney*, 123 F.3d at 997. In *J.C. Penney* and *Guardian Industries*, we found that an employer's policy permitting employees to post personal announcements and for-sale notices did not compel them to allow union postings, as long as the policy was consistently enforced. *Id.*; *Guardian Indus.*, 49 F.3d at 321-22.

In this case, although Fleming had a policy forbidding the posting of any non-company material on the bulletin boards, there was substantial evidence that this policy was not enforced. Three employees testified that they routinely saw personal notices posted on the bulletin boards. The ALJ went on to find that even though Fleming did not enforce its written policy, the company's permissive use of the bulletin boards to post personal items did not extend to organizational postings. The ALJ concluded that "there is no evidence that Fleming has ever allowed an employee to post any notice expressing ideas and designed to induce action by employees as a group, such as an investment club, travel club, sports club, religious club, political club, or any similar club or committee." Therefore, Fleming's *actual* practice of permitting personal postings, but not organizational ones, was consistently enforced.

The ALJ felt bound by the Board's decision in *Benteler Indus., Inc.*, 323 N.L.R.B. 712, 714 (1997), which held that "if the employer permits employees to use its bulletin board for the posting of notices relating to personal, nonwork-related items such as sales of personal property, cards, and thank-you notices, it cannot validly discriminate against notices of union meetings which employees have posted." In *Guardian Industries*, we explicitly rejected the position that whenever the employer permits employees any access to a bulletin board, it must permit the posting of union notices. *Guardian Indus.*, 49 F.3d at 320. We did recognize, however, that once companies allow postings of a similar character to union materials, then they may not discriminate against unions by prohibiting their postings. *Id.* Because the company in *Guardian Industries* only allowed for-sale notices, but not announcements of meetings or organizations, we held that this distinction did not "discriminate against the employees' right of self-organization." *Id.* at 321-22.

The Board attempted to distinguish this case from our decision in *Guardian Industries* by stating that Fleming allowed a "wide range of personal postings," not just for-sale notices. *In re Fleming Co., Inc.*, 336 N.L.R.B. No. 15, at *3 (2001). In *Guardian Industries*, however, we did not hold that *only* for-sale notices were distinct in character from union notices, but rather held that courts should look for disparate treatment of union postings before finding that an employer violated § 8(a)(1). *Guardian Indus.*, 49 F.3d at 320. We stated that "a rule banning all organizational notices . . . is impossible to understand as disparate treatment of unions." *Id.* Just as we have recognized for-sale notices as a category of notices distinct from organizational notices (which would include union postings), we can now add the category of personal postings. The ALJ's factual finding that Fleming did not allow the posting of organizational material on its bulletin boards does not support the conclusion that Fleming violated § 8(a)(1) by prohibiting the posting of union materials. Accordingly, we deny enforcement of the part of the Board's decision that Fleming violated § 8(a)(1) by removing union literature from company bulletin boards. We enforce the remainder of the Board's order.

A true Copy:

      Teste:

 

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*